## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
CENTER FOR EFFECTIVE                )
GOVERNMENT,                                )
                                                    )
                      Plaintiff,               )
                                                    )
              v.                                    )                Civil Action No. 13-cv-414
                                                    )                Judge Ellen S. Huvelle
U.S. DEPARTMENT OF STATE and   )
U.S. AGENCY FOR INTERNATIONAL )
DEVELOPMENT,                            )
                                                    )
                      Defendants.            )
_____  )

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, plaintiff Center for Effective Government hereby moves for summary judgment in this case brought under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, on the ground that there is no genuine issue of disputed material fact and that plaintiff is entitled to judgment as a matter of law. Defendants U.S. Department of State and U.S. Agency for International Development (USAID) have not demonstrated that the withheld record—the Presidential Policy Directive on Global Development (the Directive)—is covered by the presidential communications privilege and therefore exempt from disclosure under 5 U.S.C. § 552(b)(5). Accordingly, judgment should be entered for plaintiff.

In the alternative, if the Court determines that the privilege may apply to the Directive based on the factual assertions set forth in the government's declarations, plaintiff respectfully requests that the Court deny the pending motions for summary judgment and grant plaintiff leave to take necessary discovery.

In support of this motion and in opposition to defendants' motions for summary judgment, plaintiff submits the accompanying Memorandum in Support of Plaintiff's Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment; Plaintiff's Statement Regarding Genuine Issues and Response to Defendants' Statement of Material Facts as to Which There Is No Genuine Issue; Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue; the Declaration of Julie A. Murray and supporting attachments; the Declaration of Gavin R. Baker; and a proposed order.

Respectfully submitted,

/s/ Julie A. Murray
Julie A. Murray
DC Bar No. 1003807
Adina H. Rosenbaum
DC Bar No. 490928
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

Dated: August 1, 2013                  *Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____ )
                                  )
CENTER FOR EFFECTIVE              )
GOVERNMENT,                       )
                                  )
            Plaintiff,            )
                                  )
      v.                          )          Civil Action No. 13-cv-414
                                  )          Judge Ellen S. Huvelle
U.S. DEPARTMENT OF STATE and      )
U.S. AGENCY FOR INTERNATIONAL     )
DEVELOPMENT,                      )
                                  )
            Defendants.           )
_____ )


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Julie A. Murray
DC Bar No. 1003807
Adina H. Rosenbaum
DC Bar No. 490928
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

August 1, 2013                    *Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 3

    I.      The Rise of Presidential Directives .......................................................................... 3

    II.     The Presidential Policy Directive on Global Development ..................................... 5

    III.    The Center's FOIA Requests .................................................................................. 7

STANDARD OF REVIEW ........................................................................................................ 8

ARGUMENT ............................................................................................................................. 8

    I.      The Directive Is Not, As the Privilege Requires, a Communication Made in the Process of Shaping Policies or Making Decisions; It *Is* the Decision .................... 9

    II.     The Government Has Not Demonstrated That the Directive Is Confidential ........ 15

    III.    The Presidential Communications Privilege Does Not Apply Here Because It Has Not Been Invoked by the President or Any Other Official Qualified to Assert It .............................................................................................................. 19

    IV.    In the Alternative, the Court Should Grant the Center Leave to Conduct Discovery to Challenge the Government's Assertions ......................................... 22

CONCLUSION ....................................................................................................................... 23

## TABLE OF AUTHORITIES

**CASES**

*Alyeska Pipeline Service Co. v. EPA*,
  856 F.2d 309 (D.C. Cir. 1988) .......................................................................22

*Buruca v. District of Columbia*,
  902 F. Supp. 2d 75 (D.D.C. 2012) ................................................................15

*Citizens for Responsibility & Ethics in Washington v. DHS*,
  532 F.3d 860 (D.C. Cir. 2008) .......................................................................21

*Citizens for Responsibility & Ethics in Washington v. DHS*,
  592 F. Supp. 2d 111 (D.D.C. 2009) ..............................................................14

*Coastal States Gas Corp. v. Department of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) .......................................................................16

*Cuban v. SEC*,
  795 F. Supp. 2d 43 (D.D.C. 2011) ................................................................16

*Dellums v. Powell*,
  561 F.2d 242 (D.C. Cir. 1977) ..................................................................12, 20

*Department of State v. Ray*,
  502 U.S. 164 (1991) .........................................................................................8

*Electronic Privacy Information Center v. DOJ*,
  584 F. Supp. 2d 65 (D.D.C. 2008) ................................................................21

*Goldberg v. Department of State*,
  818 F.2d 71 (D.C. Cir. 1987) ...........................................................................8

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) .............................................................. *passim*

*Judicial Watch, Inc. v. DOJ*,
  365 F.3d 1108 (D.C. Cir. 2004) ...............................................10, 12, 14, 16, 19

*Lam Lek Chong v. DEA*,
  929 F.2d 729 (D.C. Cir. 1991) .......................................................................19

*Lardner v. DOJ*,
  No. 03-cv-0180, 2005 WL 758267 (D.D.C. Mar. 21, 2005) ..........................20

*Loving v. DOD*,
  550 F.3d 32 (D.C. Cir. 2008) ...........................................................................8, 12, 21

*Loving v. DOD*,
  496 F. Supp. 2d 101 (D.D.C. 2007) .........................................................................20, 21

*Mehl v. EPA*,
  797 F. Supp. 43 (D.D.C. 1992) ...................................................................................19

*Milner v. Department of Navy*,
  131 S. Ct. 1259 (2011) ..................................................................................................8

*Nixon v. Administrator of General Services*,
  433 U.S. 425 (1976) ...................................................................................8, 9, 12, 14

*Public Citizen v. Burke*,
  843 F.2d 1473 (D.C. Cir. 1988) ...................................................................................20

*Senate Select Committee on Presidential Campaign Activities v. Nixon*,
  498 F.2d 725 (D.C. Cir. 1974) .....................................................................................13

*Tax Analysts v. IRS*,
  117 F.3d 607 (D.C. Cir. 1997) .....................................................................................13

*Taxation with Representation Fund v. IRS*,
  646 F.2d 666 (D.C. Cir. 1981) .....................................................................................13

*United States v. Nixon*,
  418 U.S. 686 (1973) .........................................................................................9, 12, 20

*United States v. Reynolds*,
  345 U.S. 1 (1953) ........................................................................................................20

## STATUTES AND RULES

Federal Rule of Civil Procedure 56 ....................................................................................8, 22

Federal Rule of Evidence 1002 ............................................................................................15

Freedom of Information Act
  5 U.S.C. § 552(a)(3)(A) ................................................................................................8
  5 U.S.C. § 552(b) ........................................................................................................18
  5 U.S.C. § 552(b)(1) ...................................................................................................14
  5 U.S.C. § 552(b)(5) .....................................................................................................8

National Security Act of 1947, 50 U.S.C. § 401 *et seq.* ...................................................3

## EXECUTIVE ORDERS AND PRESIDENTIAL DIRECTIVES

Executive Order 13,526, 75 Fed. Reg. 707, Classified National Security Information (Dec. 29, 2009) ................................................................................................14, 17

National Security Action Memorandum 183, Space Program for the United States (Aug. 27, 1962), *available at* www.marshall.org/pdf/materials/817.pdf.............................................4

National Security Action Memorandum 357, The Technological Gap (Nov. 25, 1966), *available at* www.fas.org/irp/offdocs/nsam-lbj/nsam-357.htm ...........................................4

National Security Decision Directive 41, December 30, 1981 Sanctions on Oil and Gas Equipment Exports to the Soviet Union (June 22, 1982), *available at* www.fas.org/irp/offdocs/nsdd/nsdd-41.pdf ..............................................................................4

National Security Decision Directive 205, Acting Against Libyan Support of International Terrorism (Jan. 8, 1986), *available at* www.fas.org/irp/offdocs/nsdd/nsdd-205.pdf ..........4

National Security Decision Memorandum 117, Instructions for Strategic Arms Limitation Talks at Helsinki (SALT V) (July 2, 1971), *available at* http://nixon.archives.gov/virtuallibrary/documents/nsdm/nsdm_117.pdf .........................4

National Security Directive 54, Responding to Iraqi Aggression in the Gulf (Jan. 15, 1991), *available at* www.fas.org/irp/offdocs/nsd/nsd54.pdf...........................................................4

National Security Presidential Directive 41, Maritime Security Policy (Dec. 21, 2004), *available at* www.fas.org/irp/offdocs/nspd/nspd41.pdf.......................................................4

Presidential Decision Directive 39, U.S. Policy on Counterterrorism (June 21, 1995), *available at* www.fas.org/irp/offdocs/pdd/pdd-39.pdf .......................................................4

Presidential Directive 30, Human Rights (Feb. 17, 1978), *available at* www.fas.org/irp/offdocs/pd/pd30.pdf...............................................................................4

Presidential Policy Directive 14, Procedures Implementing Section 1022 of the National Defense Authorization Act for Fiscal Year (FY) 2012 (Feb. 28, 2012), *available at* www.justice.gov/opa/documents/ppd-14.pdf ...................................................................4

Presidential Study Directive 10, Creation of an Interagency Atrocities Prevention Board and Corresponding Interagency Review (Aug. 4, 2011), *available at* http://www.fas.org/irp/offdocs/psd/psd-10.html.................................................................5

**MISCELLANEOUS**

Department of State, Press Release, Secretaries Clinton, Gates and Geithner,
Administrator Shah and MCC CEO Yohannes to Address U.S. Global Development
Policy, Sept. 27, 2010, *available at* http://www.state.gov/r/pa/prs/ps/2010/09/
148091.htm ...........................................................................................................2, 11

Department of State & USAID, Leading Through Civilian Power: The First
Quadrennial Diplomacy and Development Review (2010), *available at*
http://www.state.gov/ documents/organization/153142.pdf .........................2, 6, 10, 11, 17

Executive Office of the President, http://www.whitehouse.gov/administration/eop....................21

Federation of American Scientists, Presidential Directives and Executive Orders,
http://www.fas.org/irp/offdocs/direct.htm ..........................................................................4

Letter from Daniel Yohannes, CEO of MCC, to Modernizing Foreign Assistance Network
(MFAN) (Feb. 2, 2012), *available at* http://www.modernizeaid.net/wp-
content/uploads/2012/04/MCC-Response.pdf .....................................................................6

Letter from Kathy Schalch, Special Assistant, Bureau of International Labor Affairs, U.S.
Department of Labor, to Didier Trinh, MFAN (Aug. 10, 2012), *available at*
http://www.modernizeaid.net/wp-content/uploads/ 2012/03/Dept-of-Labor-
Response-8-10-2012.pdf ......................................................................................................6

Memorandum from Randolph D. Moss, Acting Assistant Attorney General, Legal Effectiveness
of a Presidential Directive, as Compared to an Executive Order,
2000 WL 33155723 (Jan. 29, 2000), *also available at* http://www.justice.gov/olc/
predirective.htm ............................................................................................................5, 10

Office of Management and Budget, Executive Office of the President, Fiscal Year 2012
Budget of the U.S. Government, *available at* http://www.whitehouse.gov/sites/
default/files/omb/budget/fy2012/assets/budget.pdf ....................................................2, 10

Rajiv Shah, Administrator of USAID, President Issues First-Ever Development Policy,
USAID Impact Blog (Sept. 22, 2010), http://blog.usaid.gov/2010/09/president-
issues-first-ever-development-policy............................................................................2, 11

USAID, USAID Forward Progress Report 2013, *available at* http://www.usaid.gov/sites/
default/files/documents/1868/2013-usaid-forward-report.pdf................................6, 11, 19

White House Office of the Press Secretary, Fact Sheet: The President's Global Development
Council, Feb. 9, 2012, *available at* http://www.whitehouse.gov/the-press-
office/2012/02/09/fact-sheet-president-s-global-development-council ..............................1

White House Office of the Press Secretary, Fact Sheet: U.S. Global Development Policy,
     Sept. 22, 2010, *available at* http://www.whitehouse.gov/the-press-office/2010/
     09/22/fact-sheet-us-global-development-policy ........................................................ *passim*

White House Office of the Press Secretary, Release: Remarks by the President at the
     Millennium Development Goals Summit in New York, New York, Sept. 22, 2010,
     *available at* http://www.whitehouse.gov/the-press-office/2010/09/22/remarks-
     president-millennium-development-goals-summit-new-york-new-york........................1, 11

## INTRODUCTION

In 2010, President Obama issued with fanfare a document called the Presidential Policy Directive on Global Development (the Directive). As publicly described by the White House, the Directive "calls for the elevation of development as a core pillar of American power and charts a course for development, diplomacy and defense to mutually reinforce and complement one another in an integrated comprehensive approach to national security."[1] It "provides clear policy guidance to all U.S. Government agencies" and identifies "core objectives, [an] operational model, and the modern architecture" that the United States "need[s] to implement this policy."[2]

The Administration sought maximum attention when it issued the Directive. The President went to the United Nations to announce the Directive's new global development policy, which he described as "outlin[ing] our new approach and the new thinking that will guide our overall development efforts."[3] "Put simply," the President said, "the United States is changing the way we do business," including by altering "how we define development" and "how we view the ultimate goal of development."[4] The White House also issued a lengthy fact

---

[1] Ex. 1, Decl. of Julie A. Murray (Murray Decl.) ¶ 2, Attach. A at A1 (White House Office of the Press Secretary, Fact Sheet: U.S. Global Development Policy, Sept. 22, 2010, *available at* http://www.whitehouse.gov/the-press-office/2010/09/22/fact-sheet-us-global-development-policy (hereinafter White House Fact Sheet)).

[2] *Id.*; *see also id.* ¶ 3, Attach. B at B1 (White House Office of the Press Secretary, Fact Sheet: The President's Global Development Council, Feb. 9, 2012, *available at* http://www. whitehouse.gov/the-press-office/2012/02/09/fact-sheet-president-s-global-development-council) ("The [Directive] on Global Development provides clear guidance to all Federal agencies and sets forth a new development policy, enhanced operational model, and modern architecture for U.S. development efforts.").

[3] *Id.* ¶ 4, Attach. C at C2 (White House Office of the Press Secretary, Release: Remarks by the President at the Millennium Development Goals Summit in New York, New York, Sept. 22, 2010, *available at* http://www.whitehouse.gov/the-press-office/2010/09/22/remarks-president-millennium-development-goals-summit-new-york-new-york (hereinafter President's Remarks)).

[4] *Id.*

sheet that claims to characterize and describe in detail the Directive's contents.[5] Numerous federal agencies followed suit. The Department of State issued a press release inviting the media to a roundtable discussion with the Secretary on the policy set forth in the Directive.[6] Likewise, the Administrator of the U.S. Agency for International Development (USAID) blogged about the "launch" of the Directive, calling it "a great moment" for the country.[7] Soon after, the Administration began implementing the Directive's broad-based policy. In Fiscal Year 2012, it requested $27 billion to support the Directive.[8] And the Department of State and USAID planned to work with "more than two dozen U.S. federal agencies to ensure the implementation of the [Directive's] core objectives."[9]

Three years after the Directive's issuance, however, the Directive remains shielded from public view. The government does not contend that the Directive is or could be classified. Rather, in this Freedom of Information Act (FOIA) case, the government takes the remarkable position that the Directive—discussed so publicly and in such detail—is covered by the presidential communications privilege and thus exempt from public disclosure under FOIA Exemption 5.

---

[5] *Id.* ¶ 2, Attach. A (White House Fact Sheet).

[6] *Id.* ¶ 5, Attach. D at D1 (Department of State, Press Release, Secretaries Clinton, Gates and Geithner, Administrator Shah and MCC CEO Yohannes to Address U.S. Global Development Policy, Sept. 27, 2010, *available at* http://www.state.gov/r/pa/prs/ps/2010/09/148091.htm (hereinafter State Department Press Release)).

[7] *Id.* ¶ 6, Attach. E at E1 (Rajiv Shah, Administrator of USAID, President Issues First-Ever Development Policy, USAID Impact Blog (Sept. 22, 2010), http://blog.usaid.gov/2010/09/president-issues-first-ever-development-policy (hereinafter USAID Blog)).

[8] *Id.* ¶ 7, Attach. F at F5 (Office of Management and Budget, Executive Office of the President, Fiscal Year 2012 Budget of the U.S. Government, *available at* http://www.whitehouse.gov/sites/default/files/omb/budget/fy2012/assets/budget.pdf (hereinafter White House 2012 Budget)).

[9] *Id.* ¶ 8, Attach. G at G15 (Department of State & USAID, Leading Through Civilian Power: The First Quadrennial Diplomacy and Development Review (2010), *available at* http://www.state.gov/documents/organization/153142.pdf (hereinafter State and USAID QDDR)).

If adopted by this Court, the government's position would allow a final and official presidential decision setting broad-based federal policy to evade public view. And it would do so where the government has publicly touted the presidential decision, described the decision in detail, and even publicly quoted from the decision. Moreover, the government's position would permit others to invoke the presidential communications privilege in the President's name, thus relieving the President of his responsibility to assess whether invocation of the privilege is in the public interest.

Because the government's position cannot be squared with the proper scope of the presidential communications privilege, it must be rejected. The Directive is neither, as the presidential communications privilege requires, a communication between the President and his advisers made in the process of formulating policy or making decisions, nor confidential, as that term is used in the context of the privilege. This Court should order the Directive's release without delay.

## BACKGROUND

### I.     The Rise of Presidential Directives

Unilateral presidential action dates back to the birth of the presidency and in the modern era takes numerous forms, including executive orders, proclamations, letters to agencies, and—as is relevant to this case—presidential directives. Modern presidential directives originated during the Truman Administration and shortly after the passage of the National Security Act of 1947, 50 U.S.C. § 401 *et seq.*, which created the National Security Council (NSC). Every subsequent president has used directives to make policy in the areas of national security and foreign affairs. Directives concern diverse topical areas, including economic sanctions,

international negotiations, human rights, science policy, and space policy.[10] Some directives have had far-reaching effects for the nation, such as those announcing the imposition of sanctions on Libya, authorizing American military action after Iraq's invasion of Kuwait, and implementing the National Defense Authorization Act.[11] Moreover, some directives set widely applicable policy, including, for example, in the fields of maritime security and counterterrorism. *See*, *e.g.*, National Security Presidential Directive 41, Maritime Security Policy (Dec. 21, 2004), *available at* www.fas.org/irp/offdocs/nspd/nspd41.pdf; Presidential Decision Directive 39, U.S. Policy on Counterterrorism (June 21, 1995), *available at* www.fas.org/irp/offdocs/pdd/pdd-39.pdf.

The current Administration, like its predecessors, uses directives, which it calls Presidential Policy Directives (PPDs), to create or implement new policies. *See* Federation of American Scientists, Presidential Directives and Executive Orders, http://www.fas.org/irp/offdocs/direct.htm (last visited July 30, 2013). In addition to PPDs, the Administration issues Presidential Study Directives, which are used to direct the study of particular issues or to initiate

---

[10] *See*, *e.g.*, National Security Decision Directive 41, December 30, 1981 Sanctions on Oil and Gas Equipment Exports to the Soviet Union (June 22, 1982), *available at* www.fas.org/irp/offdocs/nsdd/nsdd-41.pdf (economic sanctions); National Security Decision Memorandum 117, Instructions for Strategic Arms Limitation Talks at Helsinki (SALT V) (July 2, 1971), *available at* http://nixon.archives.gov/virtuallibrary/documents/nsdm/nsdm_117.pdf (international negotiations); Presidential Directive 30, Human Rights (Feb. 17, 1978), *available at* www.fas.org/irp/offdocs/pd/pd30.pdf (human rights); National Security Action Memorandum 357, The Technological Gap (Nov. 25, 1966), *available at* www.fas.org/irp/offdocs/nsam-lbj/nsam-357.htm (science policy); National Security Action Memorandum 183, Space Program for the United States (Aug. 27, 1962), *available at* www.marshall.org/pdf/materials/817.pdf (space policy) (signed by National Security Advisor expressing President's wishes).

[11] *See* National Security Decision Directive 205, Acting Against Libyan Support of International Terrorism (Jan. 8, 1986), *available at* www.fas.org/irp/offdocs/nsdd/nsdd-205.pdf; National Security Directive 54, Responding to Iraqi Aggression in the Gulf (Jan. 15, 1991), *available at* www.fas.org/irp/offdocs/nsd/nsd54.pdf; Presidential Policy Directive 14, Procedures Implementing Section 1022 of the National Defense Authorization Act for Fiscal Year (FY) 2012 (Feb. 28, 2012), *available at* www.justice.gov/opa/documents/ppd-14.pdf.

policy review procedures. *See*, *e.g.*, Presidential Study Directive 10, Creation of an Interagency Atrocities Prevention Board and Corresponding Interagency Review (Aug. 4, 2011), *available at* http://www.fas.org/irp/offdocs/psd/psd-10.html.

According to the Department of Justice's Office of Legal Counsel, a "presidential directive has the same substantive legal effect as an executive order." Murray Decl. ¶ 9, Attach. H at H1 (Memorandum from Randolph D. Moss, Acting Assistant Attorney General, Legal Effectiveness of a Presidential Directive, as Compared to an Executive Order, 2000 WL 33155723 (Jan. 29, 2000), *also available at* http://www.justice.gov/olc/predirective.htm (hereinafter Moss Memorandum)). "[I]t is the substance of a presidential determination or directive that is controlling and not whether the document is styled in a particular manner." *Id.* In addition, "as with an executive order," a presidential directive does "not lose its legal effectiveness upon a change of administration." *Id.* Rather, a directive "remain[s] in force, unless otherwise specified, pending any future presidential action." *Id.*

Many directives are currently unavailable to the public. Although some directives may be unavailable because they are legitimately classified for national security reasons, others— including the Directive at issue here—are not classified.

## II.     The Presidential Policy Directive on Global Development

President Obama issued the Presidential Policy Directive on Global Development in 2010. As its name makes clear, the Directive is prescriptive. The Directive "builds on and formalizes many core tenets of the development agenda set in place by recent administrations, while embracing new priorities and approaches." *Id.* ¶ 2, Attach. A at A2 (White House Fact Sheet). For example, according to the White House fact sheet, the Directive commits the United States to undertake five specific policy approaches to development. *Id.* It commits to rebuilding

USAID as the world's premier development agency by focusing, in part, on "greater transparency" at the agency. *Id.* at A4. And it sets up new mechanisms for establishing a coherent U.S. development policy, for example by committing the Department of State and USAID to conduct a Quadrennial Diplomacy and Development Review (QDDR). *Id.*

Agencies have worked to implement the Directive since its issuance. The Department of State and USAID oversaw the first QDDR. As part of that review, the agencies described the Directive as "affirm[ing]" a "government-wide policy." *Id.* ¶ 8, Attach. G at G14 (State and USAID QDDR); *see also id.* at G8-G13, G15-G17 (discussing Directive and its role in guiding Department of State and USAID activities). And in part to meet the "high expectations" set by the Directive, USAID undertook "an ambitious reform agenda called USAID Forward" that led the agency to set new targets for its development work. *Id.* ¶ 10, Attach. I at I6 (USAID, USAID Forward Progress Report 2013, *available at* http://www.usaid.gov/sites/default/files/documents/ 1868/2013-usaid-forward-report.pdf). Likewise, numerous other agencies have publicly described their progress in implementing the Directive. The Millennium Challenge Corporation (MCC), an independent federal agency, indicates that it has responded to the Directive's "call for more targeted and purposeful coordination across [U.S.] agencies" in the areas of transparency, food security, and partnerships with select countries, and it has described in detail its activities in this regard. Letter from Daniel Yohannes, CEO of MCC, to Modernizing Foreign Assistance Network (MFAN), at 4-5 (Feb. 2, 2012), *available at* http://www.modernizeaid.net/wp-content/ uploads/2012/04/MCC-Response.pdf. Likewise, the Department of Labor indicates that it has aligned its activities in the areas of international trade and the reduction of child labor with the principles of the Directive. Letter from Kathy Schalch, Special Assistant, Bureau of International Labor Affairs, U.S. Department of Labor, to Didier Trinh, MFAN, at 3 (Aug. 10, 2012),

*available at* http://www.modernizeaid.net/wp-content/uploads/2012/03/Dept-of-Labor-Response -8-10-2012.pdf.

### III.   The Center's FOIA Requests

Plaintiff Center for Effective Government (the Center), a nonprofit research and advocacy organization that seeks to build an open and accountable government, is interested in obtaining a copy of the Directive. Ex. 2, Decl. of Gavin R. Baker (Baker Decl.) ¶¶ 2, 7. The Center conducts research on, among other things, public spending, including development aid, and it has raised concerns about the transparency of U.S. development activities. *Id.* ¶¶ 2, 4. The Center is particularly interested in the Directive's reported commitment to increasing transparency at USAID. *Id.* ¶ 6. In March 2011, after finding that the Directive was not yet publicly available, the Center submitted FOIA requests to defendants Department of State and USAID seeking a copy of the Directive. *Id.* ¶¶ 7-9.

The agencies separately denied the Center's FOIA requests. *Id.* ¶¶ 8-9. USAID stated that the Directive was subject to the deliberative process privilege and exempt from disclosure under FOIA Exemption 5 because the Directive "proposes recommendations for policy changes and is not a final decision." Doc. 11-4, Decl. of Sylvia Lankford, at 8. The Department of State contended that the Directive was subject to the presidential communications privilege and therefore exempt from disclosure under Exemption 5. Doc. 11-3, Decl. of Sheryl L. Walter, at 9. The Center appealed both denials, which were affirmed by the agencies on appeal. Baker Decl. ¶¶ 8-9. This lawsuit followed. Both agencies now argue exclusively that the Directive is exempt from disclosure as a document covered by the presidential communications privilege.

## STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. FOIA's "strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). If the government cannot "carry its burden of convincing the court that one of the statutory exemptions appl[ies]," the requested records must be released to the plaintiff. *Goldberg v. Dep't of State*, 818 F.2d 71, 76 (D.C. Cir. 1987).

## ARGUMENT

Under FOIA, each federal agency must, upon a FOIA request, make responsive records "'promptly available to any person' unless the requested records fall within one of the statute's nine exemptions," *Loving v. DOD*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(a)(3)(A)), which "must be narrowly construed," *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1262 (2011) (internal citations and quotation marks omitted). FOIA Exemption 5—the only exemption at issue in this case—protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 "incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant," including a species of executive privilege known as the presidential communications privilege. *Loving*, 550 F.3d at 37 (internal quotation marks omitted). The presidential communications privilege covers only those "communications in performance of a President's responsibilities, of his office, and made in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1976) (*GSA*) (internal quotation marks, citations, and alterations omitted).

The Directive is not covered by the presidential communications privilege for three reasons. First, it does not constitute a "communication[] . . . made in the process of shaping policies and making decisions." Rather, the Directive *is* the decision, and it is an official, far-reaching, and publicly discussed one at that. Second, the government has not demonstrated that the Directive is a confidential document as required for the privilege to apply. In the alternative, even if the privilege applied to the Directive when it was issued, the government has waived the privilege in full or in part since that time. Third, neither the President nor another official qualified to invoke the privilege has done so, as required for the privilege to attach. This Court should, therefore, deny the government's motion for summary judgment and grant the Center's motion for summary judgment. In the event that the Court does not grant the Center's motion for summary judgment, the Center seeks leave to take necessary discovery.

I.      **The Directive Is Not, As the Privilege Requires, a Communication Made in the Process of Shaping Policies or Making Decisions; It *Is* the Decision.**

The presidential communications privilege is grounded in "the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *United States v. Nixon*, 418 U.S. 686, 708 (1973). "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Id.* Accordingly, the privilege is limited to "communications[] . . . made in the process of shaping policies and making decisions." *GSA*, 433 U.S. at 449 (internal quotation marks, citations, and alterations omitted). Like other forms of privilege, the presidential communications privilege should not be "expansively construed." *Nixon*, 418 U.S. at 710. Rather, it should be interpreted "'as narrowly as is consistent with ensuring that the confidentiality of the President's decision-

making process is adequately protected.'" *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1116 (D.C. Cir. 2004) (quoting *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997)).

In this case, the Directive does not constitute a communication made in the course of shaping policy or making decisions. Instead, as the name makes clear, the "Presidential Policy Directive on Global Development" states the President's policy and directs agencies to comply. That the Directive was issued by a superior to his subordinates provides further evidence of its "directive" nature, as does the President's decision to issue the document in the form of a Presidential Policy Directive. As the Office of Legal Counsel has stated, a "presidential directive has the same substantive legal effect as an executive order," and it "remain[s] in force, unless otherwise specified," after a President leaves office. Murray Decl. ¶ 9, Attach. H at H1 (Moss Memorandum). Moreover, the Administration sought $27 billion to support the Directive and enlisted more than two dozen federal agencies to implement it. *Id.* ¶ 7, Attach. F at F5 (White House 2012 Budget); *id.* ¶ 8, Attach. G at G15 (State and USAID QDDR). In light of these facts, the government's attempt in litigation to cast the Directive as a "discussion[]" between the President and his advisors is untenable. Doc. 11-1, Defs.' Mem. in Supp. of Mot. for Summ. J. (S.J. Memo.) at 9; *see also* Doc. 11-2, Decl. of Daniel Sanborn (Sanborn Decl.) ¶ 10 (asserting that disclosure of the Directive "would reveal the form and content of sensitive Presidential deliberations").

Relying on dicta in *In re Sealed Case*, the government also contends that the presidential communications privilege covers even "final and post-decisional" communications from the President "because 'limit[ing] the President's ability to communicate his decisions privately' would 'interfer[e] with his ability to exercise control over the executive branch.'" Defs.' S.J. Memo. at 8 (quoting *In re Sealed Case*, 121 F.3d at 745-46). To begin with, the claim that

disclosure would interfere with the President's ability to control his Administration cannot justify withholding here, where the President and White House have publicly discussed and described the Directive in detail, even quoting publicly from it. As noted above, the President announced his issuance of the Directive at the United Nations, Murray Decl. ¶ 4, Attach. C (President's Remarks), and the White House released a detailed fact sheet that specifies, for example, five policy approaches to development outlined by the Directive, *id.* ¶ 2, Attach. A at A2 (White House Fact Sheet). The Department of State and USAID have also repeatedly referred to the Directive and its contents in public statements, citing the document as the basis for some of the agencies' activities. *See, e.g.*, *id.* ¶ 5, Attach. D at D1 (State Department Press Release); *id.* ¶ 6, Attach. E at E1 (USAID Blog); *id.* ¶ 8, Attach. G at G8-G17 (State and USAID QDDR); *id.* ¶ 10, Attach. I at I6 (USAID Forward Progress Report).

Furthermore, the government's position that a final presidential decision is covered by the presidential communications privilege is based on dicta and is inconsistent with the privilege's underpinnings. In *In re Sealed Case*, 121 F.3d 729, the primary case on which the government relies, the D.C. Circuit considered the propriety of a grand jury subpoena to the Office of White House Counsel seeking various documents "generated in the course of advising the President." *Id.* at 752. The documents at issue included "materials used in the investigation and formulation of several earlier drafts of [a] White House Counsel's report, notes of meetings among White House advisers, and draft press briefings." *Id.* at 746; *see also id.* at 757-58 (further describing documents). The court held that the documents were presumptively privileged under the presidential communications privilege. *See id.* at 752-53. But because the material sought was all pre-decisional, the court had no occasion to decide whether a document that is intended to convey a President's final decision on a matter concerning the operation of the

11

government may be covered by the privilege. Accordingly, the court's statement that the privilege extends to final documents was simply dicta and is not the law of the Circuit. Indeed, the Center is not aware of a single case that has held that a document constituting a final, official decision by the President is nevertheless covered by the presidential communications privilege. *Cf. Nixon*, 418 U.S. at 688, 713 (holding that tapes and documents relating to specific meetings that the President had with aides and advisors were presumptively privileged); *Loving*, 550 F.3d at 36-37, 39 (holding that agency properly withheld under FOIA documents prepared to advise the President in connection with the President's review of a soldier's death sentence); *Judicial Watch*, 365 F.3d at 1111 (considering in a FOIA case whether privilege applied to documents that dealt with internal deliberations or recommendations over presidential pardons).

Nor would a rule privileging final presidential decisions be consistent with the rationale historically used to justify the presidential communications privilege: protecting internal deliberations and discussions and the candor that comes with them. For example, in *Nixon*, 418 U.S. 683, the Supreme Court explained that the privilege ensures that a President and his advisors will "be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Id.* at 708. The Supreme Court emphasized that "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* at 705; *see also GSA*, 433 U.S. at 450 (describing the President's claim of privilege as based "on the assertion that the potential disclosure of communications given to the [President] in confidence would adversely affect the ability of future Presidents to obtain the candid advice necessary for effective decisionmaking"); *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977) (stating that the

privilege is "premised on the needs of present and future Presidents to maintain the confidentiality of communications with their advisors in order to encourage the candid advice necessary for effective decisionmaking"); *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974) (stating that the presumptive nature of the privilege is "designed to ensure that the President and those upon whom he directly relies in the performance of his duties could continue to work under a general assurance that their deliberations would remain confidential").

The need to maintain the confidentiality of private deliberations between the President and his closest advisors is not implicated in the context of a document that conveys a final presidential decision. It certainly has no bearing in a case such as this one, where the President announces his final decision publicly; the administration releases a fact sheet and numerous other statements, including some to the press, about the decision and its specific contents; and the Presidential decision is one of broad-based policy. *See* discussion, *supra*, at 1-2, 5-6. Disclosure here would not have the chilling effect on candor that animated courts in previous cases because the Directive is not a compilation of opinions or suggestions. Rather, the Directive constitutes the working law of the federal government. And, at least in the context of the deliberative process privilege, courts have repeatedly refused to protect such documents from disclosure, emphasizing FOIA's repugnance toward secret law. *See*, *e.g.*, *Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997) (holding that agency documents that provided non-binding legal guidance to field staff and that were routinely relied upon constituted "a body of secret law" and were not covered by the deliberative process privilege (internal quotation marks omitted)); *Taxation with Representation Fund v. IRS*, 646 F.2d 666, 683 (D.C. Cir. 1981) (holding that documents used

"as interpretative guides and research tools" by subordinate staff in an agency functioned as the "working law" of the agency and were not covered by the deliberative process privilege).[12]

The government argues that a separate rationale justifies extending the privilege to final decisions: the need to protect the President's "'ability to exercise control over the executive branch.'" Defs.' S.J. Memo. at 8 (quoting *In re Sealed Case*, 121 F.3d at 745-46). Although *In re Sealed Case* suggested as much in dicta, the Supreme Court in *GSA* and *Nixon* did not rely on this broad rationale. And, as a matter of logic, there is no reason why effective control over the executive branch requires secrecy of directives, as candid deliberations or discussions between the President and his closest advisors do. Nor is there any basis for the notion that the President should have the power to exercise secret control over broad-based federal policy.

In accordance with the admonition that courts must construe the presidential communications privilege narrowly, *see, e.g., Judicial Watch*, 365 F.3d at 1116; *Citizens for Responsibility & Ethics in Washington v. DHS*, 592 F. Supp. 2d 111, 118-19 (D.D.C. 2009), this Court should refuse to extend the privilege to a President's final, official decisions. Records reflecting final, official decisions do not constitute "communications . . . made in the process of shaping policies or making decisions." *GSA*, 433 U.S. at 449. Accordingly, the presidential communications privilege does not apply.

---

[12] Construing the privilege as the Center suggests would also not pose a risk of harm to national security. The President classifies information by executive order and withholds it from the public where disclosure "reasonably could be expected to result in damage to the national security," including U.S. foreign relations. Exec. Order 13,526, 75 Fed. Reg. 707, Classified National Security Information, §§ 1.1(a)(4), 6.1(cc) (Dec. 29, 2009). FOIA Exemption 1 exempts from disclosure information that is properly classified pursuant to this executive order. 5 U.S.C. § 552(b)(1). The government has never claimed that Exemption 1 is applicable here.

## II.      The Government Has Not Demonstrated That the Directive Is Confidential.

The Directive also falls outside the bounds of the presidential communications privilege because the government has not demonstrated that the Directive is—or ever was—a confidential document, as required by the presidential communications privilege. The government contends that, when the Directive was issued, the President "explicitly sought to maintain the confidentiality of the guidance involved in the Directive," Defs.' S.J. Memo. at 9, and that the Directive was sent "to a select and limited group of senior foreign policy advisors, cabinet officials, and agency heads," *id.* at 8 (internal quotation marks omitted). To support this proposition, however, the government relies exclusively on portions of the declaration of Daniel Sanborn that the Center has challenged on evidentiary grounds in a pending motion to strike. *See generally* Doc. 12, Pl.'s Mot. to Strike in Part Decl. of Daniel Sanborn (Mot. to Strike); Doc. 14, Pl.'s Reply in Supp. of Mot. to Strike. For example, the Center has challenged Mr. Sanborn's reliance on the contents of a transmittal memorandum to support an assertion that the Directive is a confidential document and has been treated as such. *See* Mot. to Strike at 4-5. The government has not produced that transmittal memorandum, and because the memorandum is the best evidence of its contents, the portions of the Sanborn declaration relying on the memorandum should be stricken under Federal Rule of Evidence 1002. *See id.* (citing, *e.g.*, *Buruca v. Dist. of Columbia*, 902 F. Supp. 2d 75, 82 (D.D.C. 2012)); *see also id.* at 5-6 (raising hearsay and personal knowledge objections to portions of the Sanborn declaration).

In any event, even if the challenged portions of the Sanborn declaration constituted admissible evidence, the declaration would still fall short of demonstrating that the Directive, when issued, was confidential. The presidential communications privilege applies only to protect certain communications authored or received by the President and his closest advisors. *See*, *e.g.*,

15

*In re Sealed Case*, 121 F.3d at 751-52; *Judicial Watch*, 365 F.3d at 1116-17. It is thus based on a presumption that documents will be held in confidence by the President and his closest advisors, not by the executive branch more generally. In this case, although the declaration describes recipients of the Directive as "senior foreign policy advisors, cabinet officials, and agency heads" and identifies the titles of some recipients, Sanborn Decl. ¶¶ 4, 9, it does not identify the titles or responsibilities of all of the individuals who received the Directive. As a result, the Center and the Court have no way of verifying whether the Directive's distribution was limited to the President's closest advisors.

In addition, the Sanborn declaration states that the National Security Staff contemplated that recipients would share the Directive within agencies or departments on a "need-to-know" basis. *Id.* ¶ 7. Courts have applied a "need-to-know" standard to determine whether an agency or corporate client has waived the confidentiality of a document purportedly subject to the attorney-client privilege. *See*, *e.g.*, *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980); *Cuban v. SEC*, 795 F. Supp. 2d 43, 56-57 (D.D.C. 2011). In these cases, the client must be "able to demonstrate that the documents . . . were circulated no further than among those members of the organization who [we]re authorized to speak or act for the organization in relation to the subject matter of the communication." *Coastal States*, 617 F.2d at 863 (internal quotation marks omitted). The government offers no evidence that such a standard was satisfied here or applied at the President's direction.

Further, the government cites no authority for its contention that a "need-to-know" standard satisfies the requirement of confidentiality for the presidential communications privilege, nor does logic support such a conclusion. A "need-to-know" standard is ill-suited— and far too expansive—to apply to a privilege that is intended to protect the confidentiality of

communications between the President and his closest advisors. Nor is it even clear what a "need-to-know" standard means in the context of a non-classified presidential decision that the Administration believed would require dozens of agencies and $27 billion to implement.[13] What is clear is that recipients of the Directive, without the President's specific approval, are permitted to assess whether another individual has a "need to know" about the Directive. And presumably such need could extend deep into executive agencies, stretching the privilege's scope beyond recognition. Indeed, in the First Quadrennial Diplomacy and Development Review (QDDR) by the Department of State and USAID, the defendants state that the team responsible for the review "was guided by the Presidential Policy Directive on Development to ensure that findings and recommendations were aligned and complementary." *See* Murray Decl. ¶ 8, Attach. G at G17 (State and USAID QDDR). Yet members of the "QDDR Leadership Team" include individuals who are not close advisors to the President, including executive-branch staff with titles such as "Office Management Specialist," "Staff Assistant," and "Advisor." *Id.* at G20. Consistent with the requirement that courts construe the presidential communications privilege narrowly, this Court should hold as a matter of law that the open-ended distribution contemplated here defeats any claim that the Directive was ever confidential, as that term is used in the context of the presidential communications privilege.

In addition, regardless of whether the presidential communications privilege applied to the Directive when the Directive was issued, the government has since waived the privilege in full or in part. Public release of a document subject to executive privilege waives the privilege "for the document or information specifically released." *In re Sealed Case*, 121 F.3d at 741. In

---

[13] Executive Order 13,526, which governs the classification of national security information, defines "[n]eed-to-know" with respect to the dissemination of "specific classified information." *Id.* § 6.1(dd). It does not, however, do so with respect to non-classified information, such as the Directive.

this case, the Sanborn declaration states not only that the Directive may be shared on a "need-to-know" basis within the agencies that received it, but that the Directive could be distributed "beyond" recipients' agencies "with[] the advance approval" of the National Security Staff. Sanborn Decl. ¶¶ 6, 7. Although the declaration does not say whether the Directive was in fact shared beyond recipients' agencies with other individuals, including people outside of the government, this type of sharing would waive the presidential communications privilege. *See In re Sealed Case*, 121 F.3d at 741-42 (holding that White House waived presidential communications privilege for "specific documents that it voluntarily revealed to third parties outside the White House"). Thus, based on the government's own statements, there is a specific, non-speculative reason to believe that the privilege has been waived, even assuming it otherwise applied.

The government has also waived any privilege with respect to at least portions of the Directive through public statements that the White House and agencies have made about the Directive's contents. A partial waiver is possible despite the government's contention that "'the presidential communications privilege applies to documents in their entirety.'" Defs.' S.J. Memo. at 8 (quoting *In re Sealed Case*, 121 F.3d at 745). That rule does not govern the question whether the government can later waive the privilege in part. Where the government has waived a privilege, it has a responsibility to assess whether the non-privileged information is segregable from the rest of the document. *See* 5 U.S.C. § 552(b) (requiring disclosure of "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt").

In this case, as the agencies acknowledge, the government has released information about the Directive through a White House fact sheet. Defs.' S.J. Memo. at 9. That fact sheet— exceeding 2,700 words in length—includes a detailed description of the Directive's contours and

18

commitments. *See* Murray Decl. ¶ 2, Attach. A (White House Fact Sheet). The public availability of information at this level of detail strongly suggests that the privilege has been waived as to the portions of the Directive discussed in the fact sheet. USAID has even quoted the Directive in a public document. *See Id.* ¶ 10, Attach. I at I6 (USAID Forward Progress Report) ("As the Presidential Policy Directive on Global Development explained, the United States 'cannot do all things, do them well, and do them everywhere.'"). At a minimum, then, the government has waived any privilege as applied to that corresponding portion of the Directive. *See Mehl v. EPA*, 797 F. Supp. 43, 49 (D.D.C. 1992) (considering whether a public report citing and discussing information in separate documents waived the deliberative process privilege as to those other documents and holding that some disclosed information was properly withheld only because it was not segregable for release).

Accordingly, if the Court reaches the waiver issue in this case, the Center respectfully requests that the Court order production of the Directive for *in camera* inspection, a decision within the Court's broad discretion. *See Lam Lek Chong v. DEA*, 929 F.2d 729, 735 (D.C. Cir. 1991). Such inspection will reveal whether the government's many public statements about the Directive, *see supra*, p. 1-2, 5-6, have waived any privilege attaching to the Directive's contents in full or in part.

**III.    The Presidential Communications Privilege Does Not Apply Here Because It Has Not Been Invoked by the President or Any Other Official Qualified to Assert It.**

The presidential communications privilege does not apply here for the additional reason that it has not been invoked by the President or any other official qualified to assert it. Although the question remains open, *Judicial Watch*, 365 F.3d at 1114, Supreme Court and D.C. Circuit case law suggests that only the current President, a former President, or the White House Counsel acting at the direction of the President may invoke the presidential communications

privilege, *see, e.g.*, *In re Sealed Case*, 121 F.3d at 744 n.16; *see also United States v. Reynolds*, 345 U.S. 1, 7-8 (1953) (stating, in the context of the military and state secrets privilege, that "[t]here must be [a] formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer" (footnotes omitted)).

Requiring formal invocation of the presidential communications privilege assures that the President has personally made a judgment that invoking the privilege is in the public interest and that he is personally accountable for that decision. The Supreme Court has observed that the privilege is properly invoked "[i]f a *President* concludes" that disclosure "would be injurious to the public interest." *Nixon*, 418 U.S. at 713 (emphasis added). Similarly, the D.C. Circuit has observed that where a former President asserts the privilege, "an incumbent President, aided perhaps by his close subordinates, must exercise some discrimination and judgment" to determine "if he wishes to support it." *Public Citizen v. Burke*, 843 F.2d 1473, 1479 (D.C. Cir. 1988); *accord Reynolds*, 345 U.S. at 8 n.20 (stating that it is essential that the decision to assert executive privilege "be taken by the minister who is the political head of the department, and that he should have seen and considered the contents of the documents and himself have formed the view that on grounds of public interest they ought not to be produced" (internal quotation marks omitted)). A President "has the primary, if not the exclusive, responsibility of deciding when presidential privilege must be claimed, when *in his opinion* the need of maintaining confidentiality in communications . . . outweighs whatever public interest or need may reside in disclosure." *Dellums*, 561 F.2d at 247 (emphasis added).

In *Lardner v. DOJ*, No. 03-cv-0180, 2005 WL 758267 (D.D.C. Mar. 21, 2005), a district court in this Circuit held that the President or his counsel need not personally invoke the privilege, at least in FOIA litigation. *See id.* at *6; *accord Loving v. DOD*, 496 F. Supp. 2d 101,

108 (D.D.C. 2007) (relying on *Lardner*), *aff'd on other grounds*, 550 F.3d 32 (D.C. Cir. 2008); *Elec. Privacy Info. Ctr. v. DOJ*, 584 F. Supp. 2d 65, 80 (D.D.C. 2008) (same). The Center believes that *Lardner* was wrongly decided. At a minimum, since *Lardner*, the D.C. Circuit has considered invocation of the privilege in a FOIA case and assumed that the White House or Office of the Vice President would need to determine whether the privilege applies. *See Citizens for Responsibility & Ethics in Washington v. DHS*, 532 F.3d 860, 866 (D.C. Cir. 2008).

In this case, the government has produced no evidence that the President invoked the privilege, either directly or through the Office of the White House Counsel. The Sanborn Declaration was submitted by the Deputy Director of the Access Management Office for the National Security Staff (NSS), Sanborn Decl. ¶ 1, which is a component of the Executive Office of the President but is not part of the smaller White House Office, *see* Executive Office of the President, http://www.whitehouse.gov/administration/eop (last visited July 28, 2013). Mr. Sanborn states that his responsibilities include "determin[ing], in consultation with counsel, whether information that is requested from NSS records is subject to a claim of privilege." Sanborn Decl. ¶ 2. Mr. Sanborn does not state, however, that he consulted with the Office of the White House Counsel about disclosing the Directive or that the President invoked the privilege directly or through his counsel. Mr. Sanborn indicates only that he has "personally reviewed [the Directive] and concluded that [it] should be withheld in full under [FOIA Exemption 5]." *Id.* ¶ 8. Under these circumstances, the government has not demonstrated that the privilege has been properly invoked by the President or his counsel or, indeed, by anyone at all. Exemption 5 thus cannot prevent the Directive's disclosure.

IV.     **In the Alternative, the Court Should Grant the Center Leave to Conduct Discovery to Challenge the Government's Assertions.**

As discussed above, the Court should grant summary judgment in the Center's favor because the presidential communications privilege does not apply to the Directive as a matter of law and because the government has failed to produce sufficient evidence demonstrating that the Directive is—or ever has been—confidential. If the Court disagrees, however, and determines that the assertions in the Sanborn declaration, if true, would be adequate to support withholding under Exemption 5, the Court should deny both parties' motions for summary judgment to allow the Center an opportunity to conduct discovery to test those assertions.

Although FOIA cases are often resolved through summary judgment, they "are not immune to summary judgment requirements." *Alyeska Pipeline Serv. Co. v. EPA*, 856 F.2d 309, 313 (D.C. Cir. 1988). Thus, "if material facts are genuinely in issue or, though undisputed, are susceptible to divergent inferences bearing upon an issue critical to disposition of the case, summary judgment is not available." *Id.* at 314. Federal Rule of Civil Procedure 56(d) allows a court to deny or defer ruling on a summary judgment motion until the non-moving party is able to conduct discovery that is necessary to that party's opposition to the motion.

Here, the Center has not had the opportunity to conduct discovery to counter the agencies' claim of privilege. As discussed in the Murray declaration, attached as Exhibit 1, information obtained from public sources and the Sanborn declaration itself suggest that discovery will reveal that the Directive has not been held in confidence by the President and his closest advisors and has instead been shared with lower-level employees within the executive branch. Murray Decl. ¶¶ 13-14. It also appears, based on the Sanborn declaration's recognition that the Directive could be shared beyond agencies so long as the NSS approved, that discovery may reveal that the Directive has been shared with third parties outside the government. *Id.*

22

Discovery would enable the Center to learn which individuals received the Directive, how the Directive has been maintained and shared by agencies, and whether the Directive has been disclosed to third parties, among other things. *Id.* ¶ 15. The Center expects that it will uncover evidence to demonstrate, contrary to the government's assertion, that the Directive is not confidential and that any applicable privilege has been waived.

Thus, if the Court determines that the privilege may apply to a final, official decision, that it was properly invoked, and that the factual assertions in the Sanborn declaration, if true, would be adequate to support withholding under Exemption 5, the Center respectfully requests that the Court deny the pending motions for summary judgment and grant the Center leave to take necessary discovery.

## CONCLUSION

For the foregoing reasons, this Court should grant the Center's motion for summary judgment and deny the motion for summary judgment submitted by the Department of State and USAID. In the alternative, the Court should grant the Center leave to take necessary discovery.

Respectfully submitted,

/s/ Julie A. Murray
Julie A. Murray
DC Bar No. 1003807
Adina H. Rosenbaum
DC Bar No. 490928
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

Dated: August 1, 2013                    *Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
CENTER FOR EFFECTIVE                    )
GOVERNMENT,                             )
                                        )
              Plaintiff,                )
                                        )
       v.                               )            Civil Action No. 13-cv-414
                                        )            Judge Ellen S. Huvelle
U.S. DEPARTMENT OF STATE and            )
U.S. AGENCY FOR INTERNATIONAL           )
DEVELOPMENT,                            )
                                        )
              Defendants.               )
_____       )

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

1.     The Center for Effective Government (the Center) submitted separate FOIA requests to the U.S. Department of State and the U.S. Agency for International Development (USAID) seeking a copy of the Presidential Policy Directive on Global Development (the Directive). Baker Decl. ¶¶ 7-9.

2.     The Department of State and USAID separately denied the Center's FOIA requests. *Id.* ¶¶ 8-9.

3.     The Center appealed both denials, which were affirmed by the agencies on appeal. *Id.*

4.     The Directive calls for the elevation of development as a core pillar of American power and charts a course for development, diplomacy and defense to mutually reinforce and complement one another in an integrated comprehensive approach to national security. Murray Decl. ¶ 2, Attach. A at A1. The Directive builds on and formalizes many core tenets of the

1

development agenda set in place by recent administrations, while embracing new priorities and approaches. *Id.* at A2.

5.       The Directive changes the way the United States does business in the field of development, including by altering how the federal government defines development and how it views the ultimate goal of development. *Id.* ¶ 4, Attach. C at C2. The Directive outlines the United States' new approach and the new thinking that will guide its overall development efforts. *Id.*

6.       The Directive affirms a government-wide policy on development. *Id.* ¶ 8, Attach. G at G14.

7.       The Directive provides clear policy guidance to all U.S. Government agencies and identifies core objectives, an operational model, and the modern architecture that the United States needs to implement this policy. *Id.* ¶ 2, Attach. A at A1.

8.       The Directive commits the United States to undertake five specific policy approaches to development. *Id.* at A2.

9.       The Directive commits to rebuilding USAID as the world's premier development agency by focusing, in part, on greater transparency at the agency. *Id.* at A4.

10.       The Directive sets up new mechanisms for establishing a coherent U.S. development policy, for example by committing the Department of State and USAID to conduct a Quadrennial Diplomacy and Development Review (QDDR). *Id.*

11.       Non-cabinet level staff in executive branch agencies participated in the QDDR process through membership on the QDDR Leadership Team. *Id.* ¶ 8, Attach. G at G20. The Team was guided by the Directive to ensure that the QDDR findings and recommendations were aligned and complementary. *Id.* at G17. The Team's membership included individuals employed

by executive branch agencies with the titles of "Office Management Specialist," "Staff Assistant," and "Advisor." *Id.* at G20.

12.     The President publicly announced his issuance of the Directive at the United Nations and described the Directive's impact on U.S. development policy. *Id.* ¶ 4, Attach. C at C2.

13.     The White House released a fact sheet containing more than 2,700 words to describe the Directive. *Id.* ¶ 2 & Attach. A.

14.     The Department of State issued a press release inviting media to a roundtable discussion with the Secretary on the policy set forth in the Directive. *Id.* ¶ 5, Attach. D.

15.      The Administrator of USAID blogged about the launch of the Directive, calling it a "great moment" for the country. *Id.* ¶ 6, Attach. E at E1.

16.     The Administration anticipated that implementation of the Directive would cost $27 billion in Fiscal Year 2012. *Id.* ¶ 7, Attach. F at F5. It sought that amount of money in its annual budget to support the Directive. *Id.*

17.     To meet the expectations set by the Directive, USAID undertook a reform agenda called USAID Forward that led the agency to set new targets for its development work. *Id.* ¶ 10, Attach. I at I6.

18.     The Department of State and USAID planned to work with more than two dozen federal agencies to implement the Directive. *Id.* ¶ 8, Attach. G at G15.

19.     The Department of State and USAID have referred to the Directive and its contents in public statements, citing the document as the basis for some of the agencies' activities. *See id.* ¶ 5, Attach. D at D1; *id.* ¶ 6, Attach. E at E1; *id.* ¶ 8, Attach. G at G8-G17; *id.* ¶ 10, Attach. I at I6.

20.     In its USAID Forward Progress Report in 2013, USAID printed a direct quotation from a portion of the Directive. *Id.* ¶ 10, Attach. I at I6. It stated: "As the Presidential Policy Directive on Global Development explained, the United States 'cannot do all things, do them well, and do them everywhere.'" *Id.*

21.     A presidential directive has the same substantive legal effect as an executive order and remains in force, unless otherwise specified, pending future presidential action. *Id.* ¶ 9, Attach. H at H1. The government, through the Department of Justice's Office of Legal Counsel, ascribes to this position. *Id.*

22.     The National Security Staff is a component of the Executive Office of the President but is not part of the White House Office. *See id.* ¶ 12, Attach. J at J1.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Julie A. Murray
Julie A. Murray
DC Bar No. 1003807
Adina H. Rosenbaum
DC Bar No. 490928
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

</div>

Dated: August 1, 2013                    *Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
CENTER FOR EFFECTIVE                    )
GOVERNMENT,                             )
                                        )
                    Plaintiff,          )
                                        )
            v.                          )            Civil Action No. 13-cv-414
                                        )            Judge Ellen S. Huvelle
U.S. DEPARTMENT OF STATE and            )
U.S. AGENCY FOR INTERNATIONAL           )
DEVELOPMENT,                            )
                                        )
                    Defendants.         )
_____ )

**PLAINTIFF'S STATEMENT REGARDING GENUINE ISSUES AND**
**RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

Plaintiff does not believe that there exist genuine issues of material fact that are necessary

to be litigated in this case. Plaintiff believes that the case can be decided based on the facts set

forth in its own statement of material facts, filed August 1, 2013, and on the cases and argument

set forth in the Memorandum in Support of Plaintiff's Motion for Summary Judgment and in

Opposition to Defendants' Motion for Summary Judgment. Plaintiff responds to the statement of

material facts filed by defendants U.S. Department of State and U.S. Agency for International

Development as follows:

1.      Undisputed.

2.      Plaintiff disputes that this paragraph sets forth a statement material to the

disposition of this case. Otherwise, this paragraph is undisputed.

3.      Plaintiff disputes that this paragraph sets forth a statement material to the

disposition of this case. Otherwise, this paragraph is undisputed.

4.      Undisputed that IPS notified plaintiff that the interagency coordination was completed and that IPS stated that the record was exempt from disclosure under FOIA Exemption 5 pursuant to the presidential communications privilege. To the extent this paragraph states that the record actually is exempt from disclosure under FOIA, it sets forth a disputed legal conclusion, not a statement of fact.

5.      Undisputed.

6.      Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. Otherwise, this paragraph is undisputed.

7.      Plaintiff does not dispute that it was informed by the Department of State that the Department's Appeals Review Panel had determined that the record must be withheld in its entirety under FOIA Exemption (b)(5). Plaintiff disputes that the letter affirming the administrative denial came from IPS. As the letter attached to the Walter declaration (Doc. 11-3, Ex. 7) indicates, the letter was signed by the Chairman of the Appeals Review Panel.

8.      Undisputed that Gavin Baker submitted a FOIA request on behalf of OMB Watch to USAID for the Presidential Policy Directive on Global Development. Plaintiff disputes that the remainder of this paragraph sets forth a statement material to the disposition of this case. To the extent that the remainder of this paragraph is material, plaintiff does not dispute that it resubmitted its FOIA request on April 6, 2011. As the first exhibit to the Lankford declaration (Doc. 11-4) indicates, however, the FOIA request was dated March 3, 2011, and initially submitted by e-mail on the same day.

9.      Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. To the extent that the paragraph is material, plaintiff has insufficient

information about the agency's internal processing of plaintiff's FOIA request to know whether the statements are true.

10.     Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. To the extent that the paragraph is material, plaintiff has insufficient information about the agency's internal processing of plaintiff's FOIA request to know whether the statements are true.

11.     Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. To the extent that the paragraph is material, plaintiff has insufficient information about the agency's internal processing of plaintiff's FOIA request to know whether the statements are true.

12.     Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. Although the date of inquiry is not material, plaintiff notes that it inquired by e-mail about the status of its FOIA request on June 27, 2011, not June 28.

13.     Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. To the extent that the paragraph is material, plaintiff has insufficient information about the agency's internal processing of plaintiff's FOIA request to know whether the statements are true.

14.     Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. USAID's September 2, 2011, letter is not the agency determination at issue in this lawsuit. *See* Lankford Decl. at 8 (agency determination dated November 22, 2011, denying "March 3, 2011 request"). To the extent that the paragraph is material, plaintiff disputes as a legal matter that USAID's letter constituted a "response" under FOIA since the letter neither granted nor denied access to the document sought by plaintiff. *See* 5 U.S.C. § 552(a)(6)(A)

3

(requiring agencies to "determine . . .whether to comply with [a FOIA] request"). Otherwise, this paragraph is undisputed.

15.    Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. Plaintiff had already requested a copy of "the actual document" in March 2011. Lankford Decl. at 6.

16.    Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. To the extent that the paragraph is material, plaintiff has insufficient information about the agency's internal processing of plaintiff's FOIA request to know whether "[o]n September 9, 2011, Kim Frazier e-mailed Patrick Lee to obtain the document." Plaintiff does not dispute that Kim Frazier advised plaintiff that she had taken this action.

17.    Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. To the extent that the paragraph is material, plaintiff has insufficient information about the agency's internal processing of plaintiff's FOIA request to know whether the statements are true.

18.    Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. To the extent that the paragraph is material, plaintiff has insufficient information about the agency's internal processing of plaintiff's FOIA request to know whether the statements are true.

19.    Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. To the extent that the paragraph is material, plaintiff has insufficient information about the agency's internal processing of plaintiff's FOIA request to know whether the statements are true.

20.    Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. To the extent that the paragraph is material, plaintiff has insufficient information about the agency's internal processing of plaintiff's FOIA request to know whether the statements are true.

21.    Undisputed.

22.    Plaintiff does not dispute that Gavin Baker submitted an administrative appeal on behalf of OMB Watch to USAID. Plaintiff disputes that the date of receipt is material to the disposition of this case. To the extent that the date is material, plaintiff has insufficient information to determine when the agency received the administrative appeal. The appeal was dated December 20, 2011. Lankford Decl. at 9.

23.    Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. Otherwise, the paragraph is undisputed.

24.    Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. Otherwise, the paragraph is undisputed.

25.    Plaintiff disputes that this paragraph sets forth a statement material to the disposition of this case. To the extent that the statement is material, plaintiff has insufficient information about the agency's internal processing of plaintiff's FOIA request to know whether the statements are true.

26.    Undisputed.

Respectfully submitted,

/s/ Julie A. Murray
Julie A. Murray
DC Bar No. 1003807
Adina H. Rosenbaum
DC Bar No. 490928
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

Dated: August 1, 2013                    *Counsel for Plaintiff*