**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                         )
CENTER FOR EFFECTIVE                                     )
GOVERNMENT,                                              )
                                                         )
                              Plaintiff,                 )
                                                         )
              v.                                         )           Civil Action No. 13-cv-414
                                                         )           Judge Ellen S. Huvelle
U.S. DEPARTMENT OF STATE and                             )
U.S. AGENCY FOR INTERNATIONAL                            )
DEVELOPMENT,                                             )
                                                         )
                              Defendants.                )
_____)

**REPLY IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Julie A. Murray
DC Bar No. 1003807
Adina H. Rosenbaum
DC Bar No. 490928
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

September 30, 2013                                       *Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .......................................................................................................................1

ARGUMENT................................................................................................................................2

    I.       The Directive Is Not Covered by the Presidential Communications Privilege
           Because It Is a Final, Official Decision ...................................................................2

    II.      The Directive Is Not—And Never Has Been—Confidential for the
           Purpose of the Presidential Communications Privilege...........................................7

    III.    The Presidential Communications Privilege Has Not Been Properly
           Invoked ...................................................................................................................17

    IV.    The Government's Opposition to the Center's Alternative Request for
           Discovery Ignores Concrete Evidence and Relies on the Wrong Legal
           Standard .................................................................................................................18

CONCLUSION............................................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Amnesty International USA v. CIA,*
    728 F. Supp. 2d 479 (S.D.N.Y. 2010) ................................................................. 3

*Baker & Hostetler LLP v. Department of Commerce,*
    473 F.3d 312 (D.C. Cir. 2006) ........................................................................... 19

*Berman v. CIA,*
    378 F. Supp. 2d 1209 (E.D. Cal. 2005), *aff'd on other grounds,*
    501 F.3d 1136 (9th Cir. 2007) ............................................................................. 3

*Carney v. DOJ,*
    19 F.3d 807 (2d Cir. 1994) ................................................................................. 19

*Center for Biological Diversity v. OMB,*
    No. 07-4997, 2008 WL 5129417 (N.D. Cal. Dec. 4, 2008) .................................. 3

*Citizens for Responsibility & Ethics in Washington v. DHS,*
    No. 06-0173, 2008 WL 2872183 (D.D.C. July 22, 2008) (*CREW I*) .................. 3

*Citizens for Responsibility and Ethics in Washington v. DOJ,*
    658 F. Supp. 2d 217 (D.D.C. 2009) (*CREW II*) .............................. 10, 11, 13, 14

*Democratic National Committee v. DOJ,*
    539 F. Supp. 2d 363 (D.D.C. 2008) ..................................................................... 3

*Department of Interior v. Klamath Water Users Protective Ass'n,*
    532 U.S. 1 (2001) ............................................................................................... 11

*Electronic Privacy Information Center v. DOJ,*
    584 F. Supp. 2d 65 (D.D.C. 2008) ....................................................................... 3

*In re Engram,*
    966 F.2d 1442 (4th Cir. 1992) ........................................................................... 20

*FTC v. Grolier Inc.,*
    462 U.S. 19 (1983) ....................................................................................... 17, 18

*Goodrich Corp. v. EPA,*
    593 F. Supp. 2d 184 (D.D.C. 2009) ................................................................... 20

*Judicial Watch, Inc. v. DOJ,*
    365 F.3d 1108 (D.C. Cir. 2004) ............................................................... 1, 2, 3, 9

*Lardner v. DOJ*,
 No. 03-0180, 2005 WL 758267 (D.D.C. Mar. 31, 2005) .......................................3, 17, 18

*Loving v. DOD*,
 550 F.3d 32 (D.C. Cir. 2008) ...........................................................................................16

*Mapother v. DOJ*,
 3 F.3d 1533 (D.C. Cir. 1993) ..............................................................................................6

*Mayer, Brown, Rowe & Maw LLP v. IRS*,
 537 F. Supp. 2d 128 (D.D.C. 2008) .....................................................................................6

*Mehl v. EPA*,
 797 F. Supp. 43 (D.D.C. 1992) ....................................................................................13, 14

*New York Times Co. v. DOD*,
 499 F. Supp. 2d 501 (S.D.N.Y. 2007)..................................................................................3

*Nixon v. Administrator of General Services*,
 433 U.S. 425 (1976)....................................................................................................1, 2, 3

*NLRB v. Sears, Roebuck & Co.*,
 421 U.S. 132 (1975) .............................................................................................................7

*In re Sealed Case*,
 737 F.2d 94 (D.C. Cir. 1984) (*In re Sealed Case II*) ....................................................8, 18

*In re Sealed Case*,
 121 F.3d 729 (D.C. Cir. 1997) ................................................................................. *passim*

*Sierra Club v. Costle*,
 657 F.2d 298 (D.C. Cir. 1981) .............................................................................................5

*United States v. Nixon*,
 418 U.S. 686 (1973)....................................................................................................2, 3, 4

## STATUTES AND RULES

Federal Register Act, 44 U.S.C. § 1505(a) .................................................................................16

Federal Rule of Civil Procedure 26(b)(5) ...................................................................................15

Freedom of Information Act
 5 U.S.C. § 552(a)(2).............................................................................................................7
 5 U.S.C. § 552(b)(5) ..........................................................................................................11

**MISCELLANEOUS**

Department of State & USAID, Leading Through Civilian Power: The First
    Quadrennial Diplomacy and Development Review (2010), *available at*
    http://www.state.gov/documents/organization/153142.pdf ..........................................4, 19

Kenneth Culp Davis, *The Information Act: A Preliminary Analysis*, 34 U. Chi. L. Rev.
    761 (1967)................................................................................................................................7

White House Office of the Press Secretary, Fact Sheet: U.S. Global Development Policy,
    Sept. 22, 2010, *available at* http://www.whitehouse.gov/the-press-office/2010/
    09/22/fact-sheet-us-global-development-policy .................................................................4

## INTRODUCTION

The presidential communications privilege covers only those "communications in performance of a President's responsibilities, of his office, and made in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1976) (*GSA*) (internal quotation marks, citations, and alterations omitted). It should be interpreted "'as narrowly as is consistent with ensuring that the confidentiality of the President's decision-making process is adequately protected.'" *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1116 (D.C. Cir. 2004) (quoting *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997)).

The Directive at issue in this FOIA case is not covered by the presidential communications privilege, and thus not exempt from disclosure under Exemption 5, for three reasons. First, the Directive constitutes a final, official decision by the President and thus falls outside the privilege's scope. At a minimum, the privilege cannot extend to final, official decisions such as this one, where the President announces his final decision publicly; the administration releases a fact sheet and numerous other statements, including press statements, about the decision and its specific contents; and the presidential decision is one of broad-based policy. Second, the Directive is not—and never has been—confidential, as must be contemplated for the privilege to apply. Third, neither the President, nor anyone else qualified to do so, has formally invoked the presidential communications privilege.

In the aggregate, the government's contrary positions would exempt from disclosure under FOIA anything the President says or writes to his senior advisors, and perhaps to others, regardless of where the communication takes place, how it takes place, to whom it is subsequently disseminated inside the government, and whether the statement sets the policy of executive branch agencies. Moreover, under the government's view, anyone with authority to

1

process FOIA requests may cite the privilege to justify withholding presidential documents, regardless of whether the President or his counsel would, if given the opportunity, invoke the privilege under the same circumstances. In sum, the government's position would amount to wholesale secrecy for the papers and statements of the American presidency, including a document—like the Directive—that the Administration anticipates will require $27 billion and dozens of agencies to implement. Because that outcome is neither consistent with precedent nor permissible under FOIA, the Directive should be released.

## ARGUMENT

### I. The Directive Is Not Covered by the Presidential Communications Privilege Because It Is a Final, Official Decision.

As the Center explained in its motion for summary judgment, the Directive is not a "communication[] . . . made in the process of shaping policies and making decisions," as required for the presidential communications privilege to attach. *GSA*, 433 U.S. at 449 (internal quotation marks omitted); *accord United States v. Nixon*, 418 U.S. 686, 708 (1973). Rather, the Directive *is* the President's final, official decision, and it is accordingly not privileged under FOIA Exemption 5. The government's contention that the presidential communications privilege extends to final, official decisions, including those that constitute "secret law," is not consistent with the Supreme Court's decisions explaining the privilege. Accordingly, it should be rejected.

**A.** The government argues that *In re Sealed Case*, 121 F.3d 729, and its progeny "have repeatedly rejected" the Center's position that the Directive—as a final, official decision— is not covered by the presidential communications privilege. Doc. 18, Defs.' S.J. Opp'n at 4 & n.1. In contrast to this case, however, *In re Sealed Case* and the D.C. Circuit's subsequent decision in *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, do not involve documents that constitute final, official decisions. *See* Doc. 15, Pl.'s S.J. Memo. at 11-12. As a result, when these cases

2

state that the presidential communications privilege covers final and post-decisional materials, they do so in dicta. *See In re Sealed Case*, 121 F.3d at 745; *Judicial Watch*, 365 F.3d at 1114 (quoting *In re Sealed Case*). Every district court case cited by the government provides only dicta as well.[1] It is thus unsurprising that the government's opposition in this regard conspicuously fails to mention any of the facts surrounding the documents in the cases cited.

This Court must instead follow the Supreme Court's decisions in *Nixon* and *GSA*. As *In re Sealed Case* recognized, both of those cases "cautioned that the privilege only applies to communications made in the *process of arriving at* presidential decisions." *In re Sealed Case*, 121 F.3d at 745 (emphasis added). *In re Sealed Case* nevertheless interpreted this principle in *Nixon* and *GSA* to mean only that "the privilege [is] limited to materials connected to presidential decisionmaking, as opposed to other executive branch decisionmaking." *Id.* But that interpretation by way of dicta is not consistent with the plain language of *Nixon* and *GSA*, which

---

[1] *See Elec. Privacy Info. Ctr. v. DOJ*, 584 F. Supp. 2d 65, 81 (D.D.C. 2008) (documents involved "matters related to the presidential decision-making process and/or matters on which the White House sought advice"); *Democratic Nat'l Comm. v. DOJ*, 539 F. Supp. 2d 363, 365 n.3 (D.D.C. 2008) (documents were e-mails that involved various plans, requests for advice, deliberations, and logistical information); *Citizens for Responsibility & Ethics in Wash. v. DHS*, No. 06-0173, 2008 WL 2872183, at *3 (D.D.C. July 22, 2008) (*CREW I*) (documents at issue in case informed "the President about the situation on the ground [regarding Hurricane Katrina]" and were "used to enable the President's advisers and their respective staffs to formulate advice and recommendations for the President" (internal quotation marks omitted)); *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 522-23 (S.D.N.Y. 2010) (documents consisted of "information or recommendations [solicited and received] in the course of gathering information related to detainee policies . . . in connection with [the President's] decisions, or potential decisions"); *N.Y. Times Co. v. DOD*, 499 F. Supp. 2d 501, 516 (S.D.N.Y. 2007) (documents "solicited advice regarding a presidential decision"); *Berman v. CIA*, 378 F. Supp. 2d 1209, 1212 (E.D. Cal. 2005), *aff'd on other grounds*, 501 F.3d 1136 (9th Cir. 2007) (documents were Presidential Daily Briefings provided by the CIA to the President and his advisors regarding national security information); *Ctr. for Biological Diversity v. OMB*, No. 07-4997, 2008 WL 5129417, at *11-*12 (N.D. Cal. Dec. 4, 2008) (documents included communications between the President's immediate advisers, updates, deliberations, advice, recommendations, and memoranda drafts); *Lardner v. DOJ*, No. 03-0180, 2005 WL 758267, at *1, *3 (D.D.C. Mar. 31, 2005) (documents consisted of advice letters and other records from pardon application files).

focus on the "process" for making decisions, not the decisions themselves. Nor is the government's position consistent with the purpose of the privilege, which is grounded in "the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *Nixon*, 418 U.S. at 708.

Moreover, even if *In re Sealed Case*'s dicta might correctly apply to some final decisions, it does not justify extending the privilege to cases like this one, where the President announces his final decision publicly, the Administration releases a fact sheet and numerous other statements about the decision and its specific contents, and the decision sets broad-based policy. That is so because neither of the rationales offered by *In re Sealed Case* to support covering final and post-decisional materials applies to the Directive. First, *In re Sealed Case* states that final and post-decisional "materials often will be revelatory of the President's deliberations—as, for example, when the President decides to pursue a particular course of action, but asks his advisers to submit follow-up reports so that he can monitor whether this course of action is likely to be successful." 121 F.3d at 745-46. A final, official decision such as the Directive is not "revelatory of the President's deliberations." Rather, the Directive "affirm[s]" a "government-wide policy," Murray Decl. ¶ 8, Attach. G at G14 (Department of State & USAID, Leading Through Civilian Power: The First Quadrennial Diplomacy and Development Review (2010), *available at* http://www.state.gov/documents/organization/153142.pdf (State and USAID QDDR)), that "builds on and formalizes many core tenets of the development agenda set in place by recent administrations, while embracing new priorities and approaches," *id.* ¶ 2, Attach. A at A2 (White House Office of the Press Secretary, Fact Sheet: U.S. Global Development Policy, Sept. 22, 2010, *available at* http://www.whitehouse.gov/the-press-office/2010/09/22/fact-sheet-us-global-

development-policy (White House Fact Sheet)). The Directive thus marks the culmination of deliberations.

Second, *In re Sealed Case* states that "release of final and post-decisional materials would . . . limit the President's ability to communicate his decisions privately, thereby interfering with his ability to exercise control over the executive branch." 121 F.3d at 746. Even assuming that the President has authority to exercise secret control over the executive branch, an assumption with which the Center disagrees, *see* Pl.'s S.J. Memo. at 14, the President's conduct with respect to the Directive makes clear that such authority is not implicated here. The President announced the Directive at the United Nations, and the White House and federal agencies trumpeted it. *See* Pl.'s S.J. Memo. at 1-2 and documents cited therein. This case is thus not comparable to the kind of informal conversation involving the President that *In re Sealed Case* had in mind when discussing the President's ability to exercise control over the executive branch. *See In re Sealed Case*, 121 F.3d at 746 n.17 (explaining that the court of appeals had "refused to require disclosure of conversations between an agency and the President or White House staff, at least where the proceeding was not adjudicatory and the statute did not specifically require disclosure, because of the President's need to oversee executive agencies" (citing *Sierra Club v. Costle*, 657 F.2d 298, 404-08 (D.C. Cir. 1981))).

**B.** The government also contends that the Center's position regarding final, official decisions is based on an erroneous conflation of the presidential communications privilege and the deliberative process privilege. In so doing, however, the government misconstrues the Center's position. The Center has not argued, as the government suggests, that the presidential communications privilege applies only to pre-decisional documents, *see* Defs.' S.J. Opp'n at 5, nor would the Center need to succeed on such an argument to prevail on its claim.

Rather, the Center contends that the presidential communications privilege—whatever its scope—does not extend to final, official decisions, at a minimum where, as here, the President announces his final decision publicly; the Administration releases a fact sheet and numerous other statements, including press statements, about the decision and its specific contents; and the decision is one of broad-based policy. Even if the Center prevails, a ruling in its favor would not foreclose a court from holding, for example, that the presidential communications privilege extends to confidential opinions that are not deliberative in nature when expressed after an earlier decision, or to factual information used in the course of deliberations, even though such information could not be withheld under the deliberative process privilege. *See*, *e.g.*, *Mapother v. DOJ*, 3 F.3d 1533, 1540 (D.C. Cir. 1993) (holding that factual portion of report that reflected no point of view was not covered by deliberative process privilege); *Mayer, Brown, Rowe & Maw LLP v. IRS*, 537 F. Supp. 2d 128, 137 (D.D.C. 2008) (holding that deliberative process privilege did not apply to post-decisional document reflecting author's opinions outside the deliberative process). Thus, the Court need not conclude that the presidential communications and deliberative process privileges are coextensive to order the Directive's release.

The government *is* correct that under the Center's position the President cannot create unclassified but "secret law" with broad application to the executive branch and its operations. The government is frank in its assertion that the President should be able to do so, stating that "some presidential decisions with the force of law necessarily will be exempt from disclosure." Defs.' S.J. Opp'n at 7-8. It thus contends that although "secret law" cannot be withheld under FOIA Exemption 5 as material protected by the deliberative process privilege, the same prohibition does not apply in the context of the presidential communications privilege.

The government's position in this regard should be rejected. There is no sound reason why "secret law" is any less abhorrent or has any less effect on the public when made by the President than when made by executive agencies. And there is no reason to believe that Exemption 5's scope should turn on such a distinction. Rather, the "governing principle" for the application of Exemption 5 generally "is that secret law is forbidden." Kenneth Culp Davis, *The Information Act: A Preliminary Analysis*, 34 U. Chi. L. Rev. 761, 797 (1967); *cf. NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (stating that courts "should be reluctant . . . to construe Exemption 5 to apply" to statements of policy and interpretations in light of FOIA's affirmative disclosure provision, which requires publication and indexing of "'statements of policy and interpretations which have been adopted by the agency'" (quoting 5 U.S.C. § 552(a)(2) and citing Davis, *The Information Act*, 34 U. Chi. L. Rev. at 797)). That principle applies with equal force in the context of the presidential communications privilege.

## II.     The Directive Is Not—And Never Has Been—Confidential for the Purpose of the Presidential Communications Privilege.

In its motion for summary judgment, the Center advanced two arguments supporting its position that the Directive is not confidential, as contemplated in the context of the presidential communications privilege, and thus not exempt from disclosure. First, the Center explained that the Directive was not confidential—and therefore not privileged—at its inception because the government expected that the Directive would be shared throughout executive agencies and, with advance approval of the National Security Staff (NSS), beyond recipient agencies. Pl.'s S.J. Memo. at 15-17. Second, the Center argued that even if the presidential communications privilege attached to the Directive at the outset, the government subsequently waived the privilege in full or in part by disseminating the Directive's contents throughout the executive branch and to the public. *Id.* at 17-19.

**A.**    The government does not respond to two key portions of the Center's motion for summary judgment with respect to the Directive's confidentiality. First, the government ignores the Center's contention that the Directive was not confidential, and therefore not privileged, at its inception; instead, the government responds only to what it casts as a "waiver" argument. *See* Defs.' S.J. Opp'n at 7. But whether the presidential communications privilege applied to the Directive at the outset is an inquiry separate from, and logically prior to, the question whether the privilege was subsequently waived. *Cf. In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984) (*In re Sealed Case II*) (stating that attorney-client privilege applies only when a communication between attorney and client is made "without the presence of strangers," and treating this inquiry as separate from determining whether the privilege is later waived (internal quotation marks omitted)). For the reasons expressed in the Center's motion for summary judgment (at pp.15-17), the privilege never applied to the Directive, so the Court need not consider whether the privilege was subsequently waived. For example, the government has not identified the titles or responsibilities of all of the individuals who received the Directive. *See* First Sanborn Decl. ¶¶ 4, 9. As a result, the Center and the Court have no way of verifying whether the Directive's distribution was limited to the President's closest advisors. Nor has the government provided any authority for the novel proposition that a document is confidential for the purpose of the presidential communications privilege where the government expressly permits recipients to share the document within their agencies on an undefined "need-to-know" basis. *See* Doc. 11-1, Defs.' S.J. Memo. at 9. In the Center's view, the mere contemplation of such open-ended sharing makes clear that the Directive was never intended to be confidential to the President and his closest advisors.

Second, although the government contends that dissemination of the Directive throughout the executive branch would not waive the presidential communications privilege, it does not address the Center's assertion (Pl.'s S.J. Memo. at 18) that—as the government's own statements make clear—the Directive was permitted to be shared *outside of* recipient agencies so long as the NSS provided advance approval. *See generally* Defs.' S.J. Opp'n at 7-12; *id.* at 15 (opposing the Center's request for discovery with reference only to distribution of the Directive within the executive branch). Indeed, the government recognizes that sharing the Directive with individuals or entities outside the government may waive the privilege, *id.* at 12, yet fails to disclaim—by evidence or even by bare assertion—that such sharing with third parties has occurred here.

**B.**     Portions of the government's opposition that *are* responsive to the Center's arguments likewise fall short. Instead of providing any information as to the number of federal employees with access to the Directive, the government instead contends that "widespread dissemination" of the Directive "within the Executive Branch" does not waive the presidential communications privilege. *Id.* at 10. In its view, so long as "the document at issue *originated* with (or at the request of) the President or one of his close advisers," it is irrelevant "whether the original recipients of the document subsequently *distributed* it beyond the President's inner circle." *Id.* at 10-11.

The government's position simply cannot be squared with the purpose of the presidential communications privilege, which necessarily limits the privilege's scope. The presidential communications privilege is based on the presumption that communications between the President and his senior advisors, not the executive branch more generally, must be held in confidence in order to protect candid discussions. *See*, *e.g.*, *In re Sealed Case*, 121 F.3d at 751-52; *Judicial Watch*, 365 F.3d at 1116-17. Here, the government has conceded that the transmittal

memorandum accompanying the Directive contemplated that recipients could share the Directive with anyone in their agencies or departments with an undefined "need to know" about it. First Sanborn Decl. ¶ 7. As discussed above (p.8), the mere contemplation of open-ended dissemination of the Directive makes clear that the Directive was not intended to be confidential at its inception, and was therefore never privileged. But even assuming that the Directive was originally privileged, it surely lost that status once it was shared throughout the executive branch, consistent with the government's initial expectation.

The government cites as supporting authority *Citizens for Responsibility and Ethics in Washington v. DOJ*, 658 F. Supp. 2d 217 (D.D.C. 2009) (*CREW II*), but that case is readily distinguishable and, in any event, wrongly decided. In *CREW*, the plaintiff sought access under FOIA to records of an interview by a government Special Counsel with Vice President Cheney in an investigation into the disclosure of a CIA operative's identity. *Id.* at 222. The government withheld the material by relying in part on Exemption 5's deliberative process and presidential communications privileges. The plaintiff argued that the Vice President waived both privileges by voluntarily agreeing to disclose the information to the Special Counsel, with whom the Vice President did not share a "commonality of interests." *Id.* at 236. The Court rejected that argument, determining that the interview was "more appropriately considered a protected inter-agency disclosure." *Id.* at 237. It also rejected the plaintiff's contention that the Vice President waived the privilege because the Special Counsel had not entered into an agreement to keep the information confidential. *Id.* at 238. The district court concluded that the Vice President's failure to invoke the privileges in that context did not preclude the White House's reliance on them at a later time. *Id.* *CREW II* did not consider the specific question at issue here, that is, whether the presidential communications privilege applies to a communication that the government

anticipates—indeed, expressly permits—to be shared widely throughout numerous executive agencies. Thus, even if *CREW II* were binding on this Court, it would not control the outcome here.

Moreover, even on its own terms, *CREW II* rests on a faulty rationale that lacks persuasive value. *CREW II* concluded that the Vice President failed to waive the presidential communications privilege because his interview with the Special Counsel constituted an "inter-agency" communication. But that fact alone does not support withholding under Exemption 5, which applies only where an "inter-agency or intra-agency" document "would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Determining that a document is inter- or intra-agency, as required to meet Exemption 5's threshold, does not resolve whether the document is privileged or answer whether that privilege has been waived. *Cf. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (stating that "[t]o qualify [for Exemption 5 protection], a document must . . . satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it"). Thus, it is no answer to an Exemption 5 waiver argument that the government has engaged in an "inter-agency" communication, if the nature of the inter-agency communication results in a waiver of the privilege.

**C.**     The government also knocks down a straw man by arguing that a limited disclosure of privileged information does not waive the privilege as applied to all documents of the same subject matter, as would occur under the attorney-client privilege. Defs.' S.J. Opp'n at 9. The problem for the government is that the Center has never argued that this Court should take an "all-or-nothing approach" to waiver of the presidential communications privilege. *In re*

*Sealed Case*, 121 F.3d at 741.[2] Indeed, the Center and the government agree that *In re Sealed Case* supplies the applicable legal standard for assessing waiver of executive privilege, including the presidential communications privilege. Both contend that release of a document subject to the presidential communications privilege "waives the privilege 'for the document or information specifically released.'" Pl.'s S.J. Memo. at 17 (quoting *In re Sealed Case*, 121 F.3d at 741); *accord* Defs.' S.J. Opp'n at 8 (quoting same).

The legal dispute between the Center and the government instead turns on what constitutes a "specific[] release[]" of a "document or information." *In re Sealed Case*, 121 F.3d at 741. Under the Center's view, releasing detailed descriptions of specific portions of the Directive (as the White House purported to do through its fact sheet)—and in at least one instance, quoting verbatim from the Directive (as USAID has done), *see* Pl.'s S.J. Memo. at 18-19—waives any privilege that might otherwise apply to corresponding portions of the Directive itself. That is so because these portions of the Directive consist of "information" that the government has already "specifically released." *In re Sealed Case*, 121 F.3d at 741. In contrast, under the government's view, so long as the government has not "specifically released" portions of the Directive *in the form of the Directive*, it may quote from and otherwise attribute material to the Directive without waiving any applicable privilege for that information in corresponding portions of the Directive. That is so, in the government's view, because the disclosed information is merely "related" to information in the Directive. Defs.' S.J. Opp'n at 9.

---

[2] Because the government relied on an undefined "need-to-know" standard to support its claim that the Directive is confidential, the Center cited cases that incorporate a "need-to-know" standard to assess whether agency or corporate clients waive the confidentiality of a document purportedly subject to the attorney-client privilege. *See* Pl.'s S.J. Memo. at 16. The Center emphasized that there was no precedent to support applying a "need-to-know" standard to assess confidentiality in the context of the presidential communications privilege, and that such a standard was "ill-suited—and far too expansive—to apply" to the presidential communications privilege. *Id.*

The government's position is nonsensical. The same information in two separate documents, one of which describes in detail or even quotes the other, is not merely "related." Under such circumstances, the information in the documents is one and the same, and the government should be required to disclose the same information consistently. Put another way, even if the Directive "contains information that was not included in the Fact Sheet," as the government asserts, *id.*, that fact says nothing about whether the government has specifically released the information that *is* in both documents.

The government's position is also inconsistent with *Mehl v. EPA*, 797 F. Supp. 43 (D.D.C. 1992), which the Center cited in its motion for summary judgment, *see* Pl.'s S.J. Memo. at 13. *Mehl* considered whether a public report citing and discussing information in underlying documents waived the application of Exemption 5 as to those separate documents. *Mehl* held that some of the information in the underlying documents was "specifically disclose[d]" by the report, although it ultimately determined that the information need not be released because it was not segregable for production. 797 F. Supp. at 48-49. The government's opposition fails to cite *Mehl*, much less distinguish it.

Instead, the government relies on *In re Sealed Case*, 121 F.3d 729, and *CREW II*, 658 F. Supp. 2d 217, but those cases provide no support for the government's position. *In re Sealed Case* considered whether and to what extent the White House waived the presidential communications privilege by releasing a final report and the type-written text of a second document. It held that the White House waived the privilege as applied to the "final report . . . and the typewritten text" as it appeared on a document that also included hand-written notations, but not as applied to the handwritten notations themselves, since the White House claimed that these handwritten marks "were not on the document sent to [the third party]." *In re Sealed Case*,

121 F.3d at 742. Thus, the Court held that release of information (there, a document that contained only type-written text) identical to information in a withheld document (a document with both type-written text and handwritten notations) waived the privilege with respect to the previously disclosed information in the withheld document. Far from foreclosing the Center's position, the Court's rationale in *In re Sealed Case* indicates that if the government, in the course of describing the Directive through the White House fact sheet or other public statements, specifically released information contained in the Directive, the privilege has been waived for those corresponding portions of the Directive.[3]

*CREW II*, 658 F. Supp. 2d 217, the second case on which the government relies, is wholly inapposite. *CREW II* considered whether the Vice President waived executive privilege based on the identity of the party to whom he disclosed information. 658 F. Supp. 2d at 236-38. It did not consider the extent of waiver with respect to the scope or nature of the information disclosed.

**D.**     The government attempts once more to justify why portions of the first Sanborn declaration are admissible as evidence. Defs.' S.J. Opp'n at 11-12. Its discussion is largely a reprise of its opposition to the Center's motion to strike, to which the Center fully responded in its reply. For example, the government continues to insist that the transmittal memorandum is part of the same document as the Directive, *id.* at 11, and therefore privileged and subject to withholding, even though, as the Center explained, the government treats the memorandum and

---

[3] It bears noting that *In re Sealed Case* cited *Mehl* with approval for the proposition that a "limited approach to waiver in the executive privilege context is designed to ensure that agencies do not forego voluntarily disclosing some privileged material out of fear that by doing so they are exposing other, more sensitive documents." 121 F.3d at 741. Thus, the D.C. Circuit was aware of *Mehl* when it fashioned its standard for waiver in *In re Sealed Case* and, in citing *Mehl* as striking the right balance with respect to waiver of executive privilege, indicated that *Mehl* is consistent with the D.C. Circuit's own decision.

the Directive as separate documents, *see* Doc. 14, Reply in Supp. of Mot. to Strike at 3. Moreover, the government ignores the Center's contention, *see id.* at 5-6, that the privilege was never properly invoked by the President, or anyone else for that matter.

One repeated analogy by the government warrants brief discussion. The government contends that it must be permitted to describe the contents of the transmittal memorandum without introducing the memorandum as evidence; otherwise "the very act of producing a privilege log would always waive the underlying claim of privilege." Defs.' S.J. Opp'n at 11. This analogy, in which a party must use privilege defensively, is inapt. Here, the only reason that the transmittal memorandum is at issue is because the government wished to rely affirmatively on its contents as evidence to bolster the government's case. The Center never sought the transmittal memorandum through FOIA or in discovery, which would have triggered production of a *Vaughn* index in a FOIA case or a privilege log in civil litigation.[4] Under these circumstances, it does not "def[y] logic," as the government contends, *id.*, to expect the government to comply with the Federal Rules of Evidence and produce the best evidence of the memorandum: the memorandum itself. Indeed, it would be patently unfair to the Center to permit the government to produce only cherry-picked portions of a document whose contents the government relies on as evidence.

The government argues in the alternative that it can prevail without reliance on the challenged portions of the first Sanborn declaration because the Directive is a "'communication[]

---

[4] In any event, Federal Rule of Civil Procedure 26(b)(5) makes clear that in civil litigation, a party's privilege log should "describe the nature of the [withheld] documents . . . without revealing information itself privileged." Here, the government contends that in describing the transmittal memorandum, it has "us[ed] part of a privileged document." Defs.' S.J. Opp'n at 11. Thus, even under the rules applicable to discovery in civil litigation, the government's comparison of its conduct here to a description of a document in a privilege log is inapt.

directly involv[ing] the President.'" *Id.* at 11-12 (quoting *Loving v. DOD*, 550 F.3d 32, 40 (D.C. Cir. 2008)) (internal alterations omitted); *see also id.* at 1 (stating that this case "begins and ends with the fact that the [Directive] is a communication directly involving the President"). But *Loving v. DOD*, 550 F.3d 32, the case on which the government relies, does not stand for the proposition that *any* communication involving the President, regardless of where it takes place, how it takes place, and to whom it is made or disseminated, is subject to the presidential communications privilege. *Loving* considered whether memoranda from the Secretaries of the Army and Department of Defense to the President providing advice regarding the review of a death sentence were covered by the presidential communications privilege. 550 F.3d at 39. The plaintiff had argued that the privilege did not apply because the President had not actually solicited the documents. In rejecting this argument, the Court stated an "established principle that communications directly involving the President . . . are entitled to the privilege, regardless of whether the President solicited them." *Id.* at 40 (internal quotation marks and citation omitted). The Court did not say, however, that this factor alone entitled communications to the presidential communications privilege. Nor would such a blanket standard make sense, amounting—as it would—to wholesale secrecy for all papers and statements of an American president. The government's standard would even exempt from disclosure a transcript of a president's speech to all federal employees or executive orders required by federal law to be made public, *see* Federal Register Act, 44 U.S.C. § 1505(a). It is absurd in its scope and should be rejected out of hand.

In short, the government cannot prevail without the contested portions of the first Sanborn declaration, and, as the Center explained in its motion to strike and corresponding reply, those portions are inadmissible under the Federal Rules of Evidence.

**III.     The Presidential Communications Privilege Has Not Been Properly Invoked.**

Relying on *Lardner v. DOJ*, No. 03-cv-0180, 2005 WL 758267 (D.D.C. Mar. 31, 2005), the government contends that FOIA does not require the President or his counsel to invoke the presidential communications privilege, even if such invocation would be required in a discovery dispute. Defs.' S.J. Opp'n at 12. In the government's view, so long as the privilege *could* extend to the Directive, were the privilege asserted, Exemption 5 applies. Specifically, the government argues that "application of FOIA Exemption 5 turns only on the 'content or nature of [the] document' and not the 'manner in which the exemption is raised in a particular request.'" *Id.* at 13 (quoting *Lardner*, 2005 WL 758267, at *7).

The Center urges this Court to reject *Lardner*, which is neither binding nor persuasive. *Lardner* considered whether "any requirement that the President personally invoke the presidential communications privilege in civil discovery . . . automatically carr[ies] over into the Exemption 5 analysis." 2005 WL 758267, at *7. It held that the President need not personally invoke the presidential communications privilege in a FOIA case, even if he must otherwise do so in civil litigation. Instead, an agency official's declaration demonstrating that a document "fall[s] within the scope of the presidential communications privilege" is sufficient to justify withholding under Exemption 5. *Id.* at *6.

To reach its holding, however, *Lardner* relied heavily on inapposite areas of FOIA law. It analogized, for example, to a circumstance in which an individual's particular need for access to privileged documents might overcome the presidential communications privilege in civil discovery, even though need is irrelevant in an Exemption 5 case. *Id.* (discussing *FTC v. Grolier Inc.*, 462 U.S. 19 (1983)). But individualized need is irrelevant in a FOIA case because Exemption 5 asks only whether a document "would be routinely or normally disclosed" in

litigation, not whether the privilege underlying Exemption 5 could be overcome in rare litigation proceedings. *Grolier*, 462 U.S. at 26 (internal quotation marks omitted). In contrast, whether the President invokes the presidential communications privilege determines whether the privilege applies to the document in the first place, not whether a privileged document would nevertheless be routinely or normally disclosed in litigation. *Cf. In re Sealed Case II*, 737 F.2d at 99 (providing that the attorney-client privilege "applies only if . . . [it] has been . . . claimed").

Moreover, the perverse consequences of the rule created by *Lardner* cast further doubt on that decision's rationale. Under *Lardner*, an agency could rely on Exemption 5 to avoid disclosure of material for which the President has expressly stated his desire not to invoke the presidential communications privilege, so long as the President could have invoked the privilege had he wished to do so. It strains credulity to believe that Congress, in adopting FOIA Exemption 5, intended to permit agencies to withhold material as privileged against the express wishes of the privilege-holder.

## IV.    The Government's Opposition to the Center's Alternative Request for Discovery Ignores Concrete Evidence and Relies on the Wrong Legal Standard.

The government contends that discovery is inappropriate here because the Center relies only on "unsupported speculation" that the privilege has been waived and has not demonstrated that the government engaged in bad faith or misconduct. Defs.' S.J. Opp'n at 15. The government's first assertion is factually incorrect, and its second relies on the wrong legal standard.

First, the Center has provided concrete support for its contention that discovery is likely to reveal that the Directive has been shared widely within the executive branch and may have been shared with third parties outside the government. Specifically, the first Sanborn declaration makes clear that the Directive could be shared within executive agencies on an undefined "need-

to-know" basis, and that it could be shared beyond those agencies, presumably with non-government third parties, so long as the NSS approved. *See* Pl.'s S.J. Memo. at 22 (citing First Sanborn Decl.). A document released by the Department of State and USAID also suggests that low-level executive branch employees, such as an "Office Management Specialist" and "Staff Assistant," have had access to the Directive. *Id.* at 17 (citing Murray Decl. ¶ 8, Attach. G. at G17, G20 (State and USAID QDDR)).

Second, the government contends that evidence of bad faith or malfeasance is required to justify discovery, Defs.' S.J. Opp'n at 15, but that is not the standard. Discovery may be appropriate if the government's affidavits are not "reasonably detailed" or if the Court is not otherwise "satisfied that no factual dispute remains." *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006) (internal quotation marks omitted). Even the primary case on which the government relies—*Carney v. DOJ*, 19 F.3d 807 (2d Cir. 1994)—makes clear that discovery in a FOIA case is appropriate where there exists "some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate." *Id.* at 812.

In response to the Center's request for discovery, the government does not disclaim that the Directive has been circulated widely, as its own evidence and public statements suggest. Indeed, the government's brief in opposition ignores altogether the Center's contention that the Directive may have been circulated to third parties outside the government. *See generally* Defs.' S.J. Opp'n at 14-16. And the first Sanborn declaration does not state that the privilege has been jealously guarded. Under these circumstances, where the government's key declaration is vague as to the extent to which the Directive has been held in confidence and the government has introduced no additional evidence to support its assertion of privilege, the Center should have the

19

opportunity to test whether the government has waived any presidential communications privilege that might attach to the Directive. *See In re Engram*, 966 F.2d 1442, at *3 (4th Cir. 1992) (unpublished) (holding that a district court properly ordered a party to respond to discovery in a FOIA suit where "evidence of waiver would be relevant to the question whether Exemption 5 applies); *Goodrich Corp. v. EPA*, 593 F. Supp. 2d 184, 188 (D.D.C. 2009) (referring to order that permitted FOIA plaintiff to depose individuals regarding alleged waiver of Exemption 5 privilege). Accordingly, if this Court determines that the privilege may apply to a final, official decision, that it was properly invoked, and that the factual assertions in the first Sanborn declaration, if true, would be adequate to support withholding under Exemption 5, the Center should be permitted to conduct discovery.

## CONCLUSION

For the foregoing reasons, this Court should grant the Center's motion for summary judgment and deny the motion for summary judgment submitted by the Department of State and USAID. In the alternative, the Court should grant the Center leave to take discovery.

Respectfully submitted,

/s/ Julie A. Murray
Julie A. Murray
DC Bar No. 1003807
Adina H. Rosenbaum
DC Bar No. 490928
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

Dated: September 30, 2013

*Counsel for Plaintiff*