UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
CENTER FOR EFFECTIVE                      )
GOVERNMENT,                               )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )  Civil Action No. 13-0414 (ESH)
                                          )
U.S. DEPARTMENT OF STATE, *et al.*,       )
                                          )
        Defendants.                       )
_____ )

## MEMORANDUM OPINION

This Freedom of Information Act ("FOIA") case pertains to a single document – the

Presidential Policy Directive on Global Development (the "PPD-6"). In 2011, plaintiff Center

for Effective Government submitted FOIA requests for this document to the U.S. Department of

State ("State") and U.S. Agency for International Development ("USAID"). Both agencies

denied the requests upon initial review and on appeal. Before the Court are parties' cross-

motions for summary judgment.[1] The sole question presented is whether the PPD-6 is protected

from disclosure under FOIA by Exemption 5's "presidential communications privilege." On

November 8, 2013, the Court ordered the government to produce a copy of the PPD-6 to the

Court for *in camera* review. (Order, Nov. 8, 2013 [Dkt. No. 21].) Upon consideration of the

---

[1] *See* Def.'s Mem. of P & A in Support of Mot. for Summ. J. ("Gov't Mot."), June 21, 2013 [Dkt. No. 11-1]; Pl.'s Mem. of P & A in Support of Pl.'s Mot. for Summ. J. and in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mot."), Aug. 1, 2013 [Dkts. No. 15-16]; Def.'s Reply Mem. of P & A in Support of Def.'s Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Gov't Reply"), Aug. 30, 2013 [Dkts. No. 17-18]; Pl.'s Reply in Support of Pl.'s Mot. for Summ. J. ("Pl.'s Reply"), Sept. 30, 2013 [Dkt. No. 20].

entire record, the PPD-6, and the parties' cross-motions for summary judgment, the Court will

deny the government's motion and grant plaintiff's motion.[2]

## BACKGROUND

On September 22, 2010, President Obama signed the PPD-6, a presidential directive.[3]

(Fact Sheet:  U.S. Global Development Policy ("PPD-6 Fact Sheet"), Sept. 22, 2010 [Dkt. No.

16-1 Att. A] at A1.)  Although the directive purports to communicate policy relevant to national

security and foreign relations topics, no part of it is classified, nor has the government claimed

any protection for the document under FOIA Exemption 1.  Indeed, upon its issuance, the White

House posted online a detailed fact sheet regarding the PPD-6, touting it as a "first of its kind by

a U.S. administration" that "recognizes that development is vital to U.S. national security and is

a strategic, economic, and moral imperative for the United States."  (*Id.*)  That same day, the

President described the PPD-6 in remarks at the Millennium Development Goals Summit as

"changing the way we do business" with regard to foreign aid and development.  (Remarks by

---

[2] Also pending before the Court is plaintiff's motion to strike certain portions of a declaration filed by the government on behalf of its motion for summary judgment.  (*See* Pl.'s Mot. to Strike in Part the Decl. of Daniel Sanborn, July 9, 2013 [Dkt. No. 12].)  Because the Court is granting plaintiff's motion for summary judgment, the Court will deny the motion to strike as moot.

[3] Presidential directives are a type of document that presidents use as "'formal notification[s] to the head of a department or other government agency informing him of a presidential decision in the field of national security affairs,' generally requiring that such department or agency take some follow-up action."  John C. Duncan, Jr., *A Critical Consideration of Executive Orders: Glimmerings of Autopoiesis in the Executive Role*, 35 Vt. L. Rev. 333, 357 (2010) (quoting Phillip J. Cooper, By Order of the President:  The Use & Abuse of Executive Direct Action 144 (2002)).  Presidential directives generally "seek to implement and coordinate military policy, foreign policy, and other policy deemed to fall within the bounds of national security."  *Id.*  For this reason, presidential directives are often classified until the sensitive issues mandating their classification are resolved.  *Id.* at 358-59.
      The Office of Legal Counsel within the Department of Justice has taken the position "that there is no substantive difference between an executive order and a presidential directive that is not styled as an executive order."  Legal Effectiveness of A Presidential Directive, as Compared to an Executive Order, 2000 WL 33155723, *1 (Op. Att'y Gen. Jan. 29, 2000).  "It is the substance of the presidential action that is determinative [of its legal effect], not the form of the document conveying that action."  *Id.*  The government continues to embrace this interpretation that presidential directives "can have the force of law."  (Gov't Reply at 7.)

the President at the Millennium Development Goals Summit in New York, New York

("Remarks"), Sept. 22, 2010 [Dkt. No. 16-1 Att. C] at C2). Despite this publicity, the President

has not publicly released the PPD-6.

As explained in a declaration filed by a senior member of the National Security Staff

("NSS"), Daniel Sanborn, "the President communicates [in the PPD-6]. . . his Administration's

global development policy objectives and priorities and how Executive Branch resources should

be organized and aligned to best achieve them." (Decl. of Daniel Sanborn ("Sanborn Decl."),

June 21, 2013 [Dkt. No. 11-2] ¶ 9.) In particular, the PPD-6 "calls for the elevation of

development as a core pillar of American power and charts a course for development, diplomacy

and defense to mutually reinforce and complement one another in an integrated comprehensive

approach to national security." (PPD-6 Fact Sheet at A1.) It also "provides clear policy

guidance to all U.S. Government agencies and enumerates [the] core objectives, [the] operational

model, and the modern architecture . . . need[ed] to implement this policy." (*Id.*)

According to Sanborn, the President initially distributed the PPD-6 to a "limited group of

senior foreign policy advisors, cabinet officials, and agency heads concerning the global

development policy of the United States." (Sanborn Decl. ¶ 4.)[4] The PPD-6 was accompanied

by a transmittal memorandum emphasizing "a need for the recipients to safeguard carefully the

Directive's content" (*id.* ¶ 5) and informing the recipients to "not distribute the document beyond

their departments or agencies without advance approval of the NSS." (*Id.* ¶ 6.) However, the

recipients were not so limited in their ability to distribute the PPD-6 within their own

departments or agencies, where it was permissible to circulate the directive on a "need-to-know

basis." (*Id.* ¶ 7.) Under this instruction, it is apparent that the PPD-6 has been widely distributed

---

[4] This "limited group" included more than thirty recipients, including members of the National Security Council, at least ten members of the Cabinet, ten presidential advisers within the White House, one foreign representative of the United States, and eight heads of non-Cabinet-level agencies.

within the Executive Branch.[5]  As one example, lower-level staff members at State and USAID used the PPD-6 during their preparation of the First Quadrennial Diplomacy and Development Review.  (*See* The First Quadrennial Diplomacy and Development Review ("QDDR"), U.S. Dep't of State and U.S. Agency for Int'l Dev. (2010) [Dkt. No. 16-1 Att. G] at G20.)  The team responsible for that review "was guided by the [PPD-6] to ensure that [the review's] findings and recommendations were aligned and complementary."  (*Id.* at G17.)  This team included QDDR senior leadership, a fourteen-member executive council, four drafters and editors, and a QDDR leadership team of at least twenty people from the Departments of State and Defense, the USAID, and the Millennium Challenge Corporation, including an "Office Management Specialist," several "Staff Assistant[s]," and an advisor serving as a Presidential Management Fellow.  (*Id.* at G20.)

In sum, the PPD-6 is a widely-publicized, non-classified Presidential Policy Directive on issues of foreign aid and development that has been distributed broadly within the Executive Branch and used by recipient agencies to guide decision-making.  Even though issued as a directive, the PPD-6 carries the force of law as policy guidance to be implemented by recipient agencies, and it is the functional equivalent of an Executive Order.  (*See supra* note 3.)  The government, however, claims that the PPD-6 is protected from disclosure under FOIA by Exemption 5's presidential communications privilege.  (Gov't Mot. at 5.)  The application of the presidential communications privilege to an unclassified, widely distributed presidential directive is an issue of first impression, but the Court is guided by Exemption 5 jurisprudence that teaches

---

[5] While the government does not provide any evidence as to the extent of the distribution, it also does not challenge plaintiff's assertion that the PPD-6 has in fact been distributed widely within the Executive Branch.  Indeed, the government premises many of its arguments on this precise assumption. (*See* Gov't Reply at 10-11.)

that the determination will ultimately turn on the "factual content and purpose of" the PPD-6.

*Dow Jones & Co. v. Dep't of Justice*, 917 F.2d 571, 575 (D.C. Cir. 1990).[6]

## LEGAL ANALYSIS

### I.   EXEMPTION 5:  PRESIDENTIAL COMMUNICATIONS PRIVILEGE

"FOIA directs that 'each agency, upon any request for records . . ., shall make the records

promptly available to any person' for 'public inspection and copying,' unless the records fall

within one of the exclusive statutory exemptions." *Judicial Watch, Inc. v. Dep't of Justice*, 365

F.3d 1108, 1112 (D.C. Cir. 2004) (quoting 5 U.S.C. § 552(a)(2), (a)(3)(A)).  "The basic purpose

of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society,

needed to check against corruption and to hold the governors accountable to the governed."

*N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978); *see also N.L.R.B. v. Sears,*

*Roebuck & Co.*, 421 U.S. 132, 153 (1975) (concluding that FOIA "represents a strong

congressional aversion to secret (agency) law, and represents an affirmative congressional

purpose to require disclosure of documents which have the force and effect of law." (internal

---

[6] The Court notes that Judge Howell recently granted summary judgment for the government in a case concerning a plaintiff's FOIA request for a partially classified presidential directive regarding cybersecurity policy. *See Elec. Privacy Info. Ctr. v. Nat'l Sec. Agency* ("*EPIC*"), --- F. Supp. 2d ---, 2013 WL 5701645, *5-7 (D.D.C. Oct. 21, 2013).  Judge Howell did not, however, rule based on the presidential communications privilege. *Id.* at *5.  Instead, Judge Howell *sua sponte* held that the presidential directive at issue in that case was not an "agency record" subject to the disclosure requirements under FOIA because, under Circuit law, *see Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013), the defendant-agency was not in "control" of the directive at the time the FOIA request was made. *See EPIC*, 2013 WL 5701645 at *5.  In determining that the defendant-agency lacked "control" of the directive, Judge Howell considered it important that "only specific, high-ranking Presidential advisors were given the directive, they could only distribute the directive to those within their agencies with a 'need to know,'" and any broader dissemination would require "express permission from the White House." *Id.* at *6.  Judge Howell accordingly concluded that it was the White House, not the defendant-agency, that maintained "control" over the disputed directive, "making it a non-agency record for the purposes of FOIA." *Id.* at *7.
        Here, the government does not argue that the PPD-6 is not an "agency record," so this Court need not decide if it will follow Judge Howell's rationale.  Moreover, the Court notes that unlike the directive at issue here, the directive in *EPIC* was partially classified.

quotation marks and citations omitted)).  Pursuant to this purpose, FOIA is broadly conceived to

permit access to "official information" as part of a "general philosophy of full agency

disclosure," *EPA v. Mink,* 410 U.S. 73, 80 & n. 6 (1973) (citation omitted), such that "the

Government's activities be opened to the sharp eye of public scrutiny."  *U.S. Dep't of Justice v.*

*Reporters Comm. for Freedom of Press*, 489 U.S. 749, 774 & n.20 (1989) (emphasis omitted).

"FOIA thus mandates that an agency disclose records on request, unless they fall within one of

nine exemptions.  These exemptions are 'explicitly made exclusive,' and must be 'narrowly

construed,'" *Milner v. Dep't of Navy*, --- U.S. ---, 131 S. Ct. 1259, 1262 (2011) (quoting *Mink*,

410 U.S. at 79, & *FBI v. Abramson*, 456 U.S. 615, 630 (1982)), and it is the government's

burden to prove that a given exemption applies.  *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20,

30 (D.C. Cir. 1998).

        The exemption at issue in this case – Exemption 5 – "allows the government to withhold

'inter-agency or intra-agency memorandums or letters which would not be available by law to a

party . . . in litigation with the agency.'"  *Judicial Watch*, 365 F.3d at 1113 (quoting 5 U.S.C. §

552(b)(5)).  Exemption 5 "incorporates the traditional privileges that the Government could

assert in civil litigation against a private litigant," *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C.

Cir. 2008) (internal quotation marks omitted), including the presidential communications

privilege. *Judicial Watch*, 365 F.3d at 1113; *see also Sears, Roebuck & Co.*, 421 U.S. at 149

n.16 & 150.  The test under Exemption 5 is whether, upon a showing of relevance, the

documents would "routinely" or "normally" be disclosed in a civil discovery context.  *U.S. Dep't*

*of Justice v. Julian*, 486 U.S. 1, 12 (1988).  As described by the Supreme Court, "Exemption 5,

properly construed, calls for 'disclosure of all 'opinions and interpretations' which embody the

agency's effective law and policy, and the withholding of all papers which reflect the agency's

group thinking in the process of working out its policy and determining what its law shall be.'"

*Sears, Roebuck, & Co.*, 421 U.S. at 153 (quoting Kenneth Culp Davis, *The Information Act: A Preliminary Analysis*, 34 U. Chi. L. Rev. 761, 797 (1967)).

The presidential communications privilege is a "presumptive privilege for [p]residential communications," *United States v. Nixon*, 418 U.S. 683, 708 (1974), that "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Loving*, 550 F.3d at 37; *see also In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) ("[T]he privilege itself is rooted in the need for *confidentiality* to ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge." (emphasis added)). The privilege protects those "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential," and, once the privilege is invoked, the documents become presumptively privileged. *In re Sealed Case*, 121 F.3d at 744. Further, unlike the deliberative process privilege, which is also encompassed under Exemption 5, the presidential communications privilege "applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones." *Id.* at 745.

In addition to protecting communications that "directly involve" the President, *see Loving*, 550 F.3d at 39 (quoting *Judicial Watch*, 365 F.3d at 114), the privilege also protects

> communications authored or solicited and received by *those members of an immediate White House adviser's staff* who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate.

*In re Sealed Case*, 121 F.3d at 752 (emphasis added). Communications authored or solicited and received by these advisers are protected because they "are close enough to the President to be revelatory of his deliberations or to pose a risk to the candor of his advisers." *Id.*

The scope of the privilege is to be "construed as narrowly as is consistent with ensuring that the confidentiality of the President's decision-making process is adequately protected." *Judicial Watch*, 365 F.3d at 1116 (quoting *In re Sealed Case*, 121 F.3d at 752); *see also Abramson*, 456 U.S. at 630 ("FOIA exemptions are to be narrowly construed."). As such, it "only applies to communications that . . . advisers and their staff author or solicit and receive in the course of performing their function of advising the President on official government matters" and does not generally "extend to staff outside the White House in executive branch agencies." *In re Sealed Case*, 121 F.3d at 752; *see also Judicial Watch*, 365 F.3d at 1116. "[T]here is, in effect, a hierarchy of presidential advisers such that the demands of the privilege become more attenuated the further away the advisers are from the President operationally." *Judicial Watch*, 365 F.3d at 1115.[7]

## II. THE PPD-6

As noted, no case has addressed this privilege in terms of a presidential directive. Rather, courts have considered the application of the presidential communications privilege to audio recordings of confidential communications between the President and his advisers, *see, e.g.*, *Nixon v. Adm'r of Gen. Servs.* ("*GSA*"), 433 U.S. 425, 446-50 (1977) (protected even for past

_____

[7] *Judicial Watch* is the most instructive case on the limited scope of the presidential communications privilege. In that case, the government sought to extend the privilege beyond the President's inner circle of advisers "to officials within the Justice Department whose sole function . . . is to advise and assist the President in the performance of his non-delegable pardoning duty." *Judicial Watch*, 365 F.3d at 1114. The D.C. Circuit "decline[d] to sanction such an extension of the presidential communications privilege to all agency documents prepared in the course of developing the Deputy Attorney General's pardon recommendations for the President." *Id.* at 1114. Instead, the Court limited the privilege to those documents created by Justice Department officials that were "solicited and received by the President or his immediate White House advisers who have broad and significant responsibility for investigating and formulating the advice to be given the President." *Id.* (internal quotation marks omitted). The Court reasoned that the interests of confidentiality and candor that underlie the privilege simply do not justify its application to advisory documents that "never ma[de] their way to the Office of the President." *Id.* at 1115.

presidents); *Nixon*, 418 U.S. at 708-13 (protected by qualified privilege from criminal

subpoenas); deliberative documents created by White House advisers, but never viewed by the

President, *see In re Sealed Case*, 121 F.3d at 752 (protected to the extent "made . . . in the course

of preparing advice for the president"); agency documents created to advise, but never reaching,

the Office of the President, *see Judicial Watch*, 365 F.3d at 1114-15 (not protected); and

advisory documents from an agency that were not solicited, but were received, by the President,

*see Loving*, 550 F.3d 39-40 (protected).  But never before has a court had to consider whether the

privilege protects from disclosure under FOIA a final, non-classified, presidential directive that

has been distributed widely within the Executive Branch and serves as guidance for several

policy-making bodies, including twenty-two Executive Branch agencies, as well as the NSS and

National Security Council ("NSC") Deputies and Principals.

As such, this case "calls upon the court to strike a balance between the twin values of

transparency and accountability of the executive branch on the one hand, and on the other hand,

protection of the confidentiality of Presidential decision-making and the President's ability to

obtain candid, informed advice." *Judicial Watch*, 365 F.3d at 1112.  In so doing, the Court must

bear in mind that "[t]he very reason that presidential communications deserve special protection,

namely the President's unique powers and profound responsibilities, is simultaneously the very

reason why securing as much public knowledge of presidential actions as is consistent with the

needs of governing is of paramount importance." *In re Sealed Case*, 121 F.3d at 749.

Plaintiff argues that the PPD-6 is not protected by the presidential communications

privilege because it was not made in the course of making decisions, but instead is the *final

decision itself* – one that has been widely circulated and implemented within the Executive

Branch.  (Pl.'s Mot. at 9-10.)  The Government takes the position that the PPD-6 is protected by

the privilege because, regardless of how widely the document has been distributed within the

Executive Branch, it *originated with the President*, and relying on *In re Sealed*, the privilege

protects the President's final decisions.  (Gov't Reply at 10-11.)

It is true that the D.C. Circuit has, in dictum, referred to the presidential communications

privilege as protecting not only deliberative documents, but also "final and post-decisional

materials."  *In re Sealed Case*, 121 F.3d at 745; *see also Loving,* 550 F.3d at 37; *Judicial Watch*,

365 F.3d at 1114.  But the D.C. Circuit has never actually applied the presidential

communications privilege to a "final" presidential directive or decision. [8]  Instead, the privilege's

application to "final" decisions, as in any other circumstance, is no broader than necessary to

ensure that the confidentiality of the presidential decision-making process, and its concomitant

decision-making benefits, are "'adequately protected.'"  *See Judicial Watch*, 365 F.3d at 1116

(quoting *In re Sealed Case*, 121 F.3d at 752).

As described above, the presidential communications privilege generally is "premised on

the needs of present and future Presidents to maintain the confidentiality of communications with

their advisors in order to encourage the candid advice necessary for effective decisionmaking."

*Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977); *see also Loving*, 550 F.3d at 37; *In re

Sealed Case*, 121 F.3d at 750.  Confidentiality is the touchstone of the privilege, for

"[c]onfidentiality is what ensures the expression of 'candid, objective, and even blunt or harsh

---

[8] In *In re Sealed Case*, while the Court of Appeals defined the "[g]eneral [c]ontours of the [p]residential [c]ommunications [p]rivilege," 121 F.3d at 742-46, it did not address a final decision, but limited its holding of privilege to *pre-decisional* "outlines of issues and questions that needed to be investigated and drafts" of White House Counsel's reports, as well as notes of meetings and phone conversations.  *Id.* at 757-58.  And although both *Loving* and *Judicial Watch* incorporated *In re Sealed Case*'s explication that the privilege covers "final" documents, neither case applied the privilege to a final document.  *See Loving*, 550 F.3d at 39 (advisory memoranda sent to the President by the Army and Defense Secretaries and the Judge Advocate General were protected by the privilege); *Judicial Watch*, 365 F.3d 1117-18 (agency advisory materials never submitted to the President for his consideration are not protected by the privilege).

opinions' and the comprehensive exploration of all policy alternatives before a presidential course of action is selected." *In re Sealed Case*, 121 F.3d at 750 (quoting *Nixon*, 418 U.S. at 708). Thus, when a court decides whether the privilege extends to a document or class of documents, it must ask whether application of the privilege is necessary to protect the confidentiality of communications as between the President and his advisers.

The rationale of *In re Sealed Case* is instructive. In ruling in dictum that the privilege can apply to "final" documents, the Court of Appeals rested on the fact that the privilege also protects the President's ability to "operate effectively." *In re Sealed Case*, 121 F.3d at 745. However, this broad purpose is not implicated in this case. First, this is not a case involving "a quintessential and nondelegable Presidential power" – such as appointment and removal of Executive Branch officials, *see In re Sealed Case*, 121 F.3d at 752-53 – where separation of powers concerns are at their highest. Instead, the development and enactment of foreign development policy can be and is "exercised or performed without the President's direct involvement." *See id.* at 753. Second, having reviewed the PPD-6, the Court finds, contrary to the assertions in the Sanborn Declaration (Sandborn Decl. ¶ 10), that the forward-looking PPD-6 is not "revelatory of the President's deliberations" such that its public disclosure would undermine future decision-making. *Cf. In re Sealed Case*, 121 F.3d at 745-46. Finally, the "President's ability to communicate his [final] decisions privately," *id.* at 746, is not implicated, since the PPD-6 was distributed far beyond the President's close advisers and its substance was widely discussed by the President in the media. In short, there is simply no indication from *In re Sealed Case* that the D.C. Circuit specifically considered, no less endorsed, the extension of the presidential communications privilege to presidential communications distributed and implemented widely throughout the Executive Branch.

Moreover, here there is *no* evidence that the PPD-6 was intended to be, or has been treated as, a confidential presidential communication.[9] First, the PPD-6 is a non-classified document setting forth Executive Branch policy that lacks any inherent (or claimed) basis for secrecy. Indeed, the PPD-6 initially was distributed to more than thirty members of the Executive Branch, many of whom serve no role in either the Cabinet or NSC. As such, the claim of the privilege is absent of any "need to protect military, diplomatic, or sensitive national security secrets," but instead it "depends solely on the broad, undifferentiated claim of public interest in the confidentiality of" the document. *See Nixon*, 418 U.S. at 706.

Second, from its issuance, the President has publicly touted the directive, referring to it as a "chang[e] [in] the way [the United States] do[es] business" with regard to foreign aid and development (Remarks at C2) and informing the public in no uncertain terms that the document "provides clear policy guidance to all U.S. Government agencies" regarding the trajectory of U.S. development policy. (PPD-6 Fact Sheet at A1; *see also* Remarks at C2 (describing the PPD-6 as "outlin[ing] our new approach and the new thinking that will *guide* our overall development efforts" (emphasis added)).) Moreover, the fact sheet released for the PPD-6 described in detail the goals and initiatives set forth therein, copying verbatim many portions of the PPD-6, and closely paraphrasing (although not copying verbatim) other sections of the PPD-6. (PPD-6 Fact Sheet at A2-5.) Although the government is correct that the disclosure of portions of a document subject to the presidential communications privilege does not waive the privilege as to the entire document, *see In re Sealed Case*, 121 F.3d at 745, the widely publicized

---

[9] Although the Sanborn Declaration states that the PPD-6 "is a confidential communication from the President to a select and limited group of senior foreign policy advisors, cabinet officials, and agency heads concerning the global development policy of the United States" (Sanborn Decl. ¶ 4), that statement is conclusory, belied by the evidence (including other portions of the same declaration), and ultimately insufficient to demonstrate that the PPD-6 was intended to be, or has been treated as, confidential for the purposes of the presidential communications privilege.

nature of the PPD-6 is important in considering the confidentiality interests implicated by the

directive's disclosure under FOIA.

Third, although the original recipients of the PPD-6 were instructed not to distribute the

directive beyond their departments or agencies without approval of the NSS (Sanborn Decl. ¶ 6),

they were free to distribute the directive within their departments or agencies based on an

undefined "need-to-know" basis.  (*Id.* ¶ 7.)  Of course, permitting distribution of a document on a

"need-to-know" basis does not automatically undermine the confidentiality of a document.  *See,*

*e.g.*, *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980)

(concluding distribution on "need-to-know" basis does not undermine attorney-client privilege).

But "need to know" must be defined, and adhered to, in a context-specific manner for a given

privilege to apply.  *See id.* (limiting "need to know" in the attorney-client privilege context to

those "who are authorized to speak or act for the organization in relation to the subject matter of

the communication" (internal quotation marks omitted)).  And, the government has not, even

after plaintiff raised the issue (Pl.'s Mot. at 16-17), defined what "need to know" means as to an

extensive intra-agency distribution of the PPD-6.

This failure on the part of the government is important.  As in the attorney-client

privilege context, the scope of the "need to know" is relevant to the presidential communications

privilege, where, for the privilege to apply, the *reason* a given recipient "needs to know" must

implicate the purposes that animate the privilege:  the promotion of candor and effective

presidential decision-making.  As noted by the D.C. Circuit, it is a party's "operational proximity

to the President" that matters in determining whether "[t]he President's confidentiality interest"

is implicated.  *See Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 910 (D.C.

Cir. 1993).  Thus, it is axiomatic that the privilege's purpose of promoting candor and

confidentiality between the President and his closest advisers becomes more attenuated, and the

public's interest in transparency and accountability more heightened, the more extensively a

presidential communication is distributed. *Cf. In re Sealed Case*, 121 F.3d at 749-50 (endorsing

only "limited extension of the privilege" "down the chain of command" to the President's

"immediate advisors"); *id.* at 752 ("[N]ot every person who plays a role in the development of

presidential advice, no matter how remote and removed from the President, can qualify for the

privilege. In particular, the privilege should not extend to staff outside the White House in

executive branch agencies.").

In *Judicial Watch*, the D.C. Circuit grappled with an analogous issue and ultimately held

that the presidential communications privilege attaches to a document prepared by a low-level

agency staff member only if there is an actual advisory relationship between the President and

the staffer as to that specific document. *See* 365 F.3d at 1117. That is, outside of the President's

inner circle, the privilege will not attach to even advisory communications that do not reach the

desk of the President or his closest advisers. *See id.* This is so because such communications are

unlikely to be "relevatory of [the President's] deliberations," and the President's ability to

"obtain information from all knowledgeable sources" is not undermined by protecting *only* those

sources of information that actually make their way to the Office of the President. *Id.* (internal

quotation marks omitted). The government offers no persuasive rationale why this principle

should not also extend to documents *created by the President* and widely transmitted to multiple

agencies and their staffers who serve in *non-advisory* roles to the President. Just like agency

advisory documents that never reach the Office of the President, documents distributed from the

Office of the President for non-advisory purposes do not implicate the goals of candor, opinion-

gathering, and effective decision-making that confidentiality under the privilege is meant to protect.[10]

Simply put, the purposes of the privilege are not furthered by protecting from public disclosure presidential directives distributed beyond the President's closest advisers for non-advisory purposes. Nor does invocation of an amorphous "need to know" cure the problem where there is no claim of an advisory role between the document-recipient and the President. Thus, since the government has not satisfied its burden to demonstrate that the document was intended to be confidential for the purpose of the presidential communications privilege, the Court cannot agree that Exemption 5 applies to the PPD-6.

Even more troubling for the government, however, is the evidence that the PPD-6 has in fact been distributed widely within the Executive Branch for non-advisory purposes. Indeed, the government does not challenge plaintiff's assertion that the PPD-6 has been, at least with regard to the QDDR, distributed to lower-level staff members within the Executive Branch for the purpose of implementation. (*See* QDDR at G20.) Instead, the government doubles down and asserts that as a matter of law "widespread dissemination of the PPD-6 within the Executive Branch" does not undermine the confidentiality of the document for the purpose of the

---

[10] Indeed, the D.C. Circuit has emphasized that the distinction between advisory and non-advisory roles "is particularly important in regard to those officials who exercise substantial independent authority or perform other functions in addition to advising the President, and thus are subject to FOIA and other open government statutes." *In re Sealed Case*, 121 F.3d at 752. The Court warned:

> The presidential communications privilege should never serve as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President. If the government seeks to assert the presidential communications privilege in regard to particular communications of these "dual hat" presidential advisers, the government bears the burden of proving that the communications occurred in conjunction with the process of advising the President.

*Id.* That the Court of Appeals made these observations in the context of "dual hat" presidential advisers who work *within* the White House, *id.*, only implies that the distinction is all the more relevant for members of the Executive Branch who work outside of the White House for whom the privilege does not generally apply.

presidential communications privilege. (Gov't Reply at 10.) Rather, the government takes the

position that the only relevant question is "whether the document at issue *originated* with (or at

the request of) the President or one of his close advisers" (*id.* (emphasis in original)), and, if the

answer is yes, the fact that the "original recipients of the document subsequently *distributed* it

beyond the President's inner circle" is irrelevant. (*Id.* at 11 (emphasis in original).)

This position is flawed. First, the government seems to base its argument on the

fundamental and oft-repeated principle that communications that "'directly involve'" the

President are covered by the privilege. *See Loving*, 550 F.3d at 39 (quoting *Judicial Watch*, 365

F.3d at 1114). But no court has suggested that the mere fact that a President's direct

involvement in a communication, either as an author or recipient, renders it automatically

protected. Instead, the privilege has always been limited to certain *types* of communications

directly involving the President, specifically those "communications 'in performance of (a

President's) responsibilities' 'of his office' and made 'in the process of shaping policies and

making decisions.'" *GSA*, 433 U.S. at 449 (quoting *Nixon*, 418 U.S. at 711, 713, & 708).

Second, the primary case cited by the government, *Citizens for Responsibility & Ethics in

Washington v. U.S. Dep't of Justice*, 658 F. Supp. 2d 217 (D.D.C. 2009), is distinguishable on

several grounds. In that case, the Court held that then-Vice President Cheney did not waive the

presidential communications privilege for certain information by disclosing that information to a

single Special Counsel appointed to investigate the leak of a CIA operative's identity. *Id.* at 237-

38. That case simply did not consider, and does not speak to, the specific issue raised here – the

effect of *widespread* distribution throughout the Executive Branch of a *final*, *non-classified*

presidential communication that carries the force of law.

Finally, the government relies on a negative inference:  because plaintiff "cannot identify a single case suggesting that the applicability of the presidential communications privilege turns on the scope of the document's distribution within the Executive Branch," it must be the case that the privilege does not so turn.  (Gov't Reply at 11.)  This same argument can be levied against the government, since there is no case squarely supporting the position that a presidential communication originating with the President may be distributed widely beyond the President's inner circle without affecting the document's confidentiality.[11]

It is also worth emphasizing the unbounded nature of the government's position.  In the government's view, it can shield from disclosure under FOIA *any* presidential communication, even those – like the PPD-6 – that carry the force of law, simply because the communication originated with the President.  That the communication might be applied by low-level agency staff members in their day-to-day activities, which affect millions of American citizens, would not be relevant to deciding whether the directive is exempt from disclosure under FOIA.  Rather, under the government's approach, the inquiry would begin and end with whether the President made the initial decision.

The Court rejects the government's limitless approach as "inconsistent with the nature and principles of the presidential communications privilege, as well as the goal of best serving the public interest."  *Cf. Judicial Watch*, 365 F.3d at 1117 (rejecting a proposed "bright-line rule").  The purpose underlying the distribution of a presidential communication beyond the President's closest advisers is paramount.  If distribution is limited to advisory purposes, the

---

[11] The likely explanation for the dearth of cases on point is that this particular phenomenon – broad-scale policy making through non-public but non-classified presidential directives that carry the force of law and are implemented by agency staff – is a relatively new one.  Similar broad-based policy making at the presidential level is usually undertaken through Executive Orders, which generally are published in the Federal Register.  *See* 44 U.S.C. § 1505(a)(1).

privilege may apply; but if distribution is far broader, the purposes animating the privilege will not justify its application.

Moreover, while it is certainly possible that some low-level Executive Branch staff members act in an advisory role (or facilitate their supervisor's advisory role) to the President (although there is *no* evidence that this is the case here), *cf. Judicial Watch*, 365 F.3d at 1118, it is not likely that *each and every* staff member who receives a widely distributed presidential directive will act solely in an advisory role. This is particularly so in cases, such as this one, where the directive carries the force of law and is intended to provide guidance for Executive Branch policy making. Thus, considering the widespread dissemination of the PPD-6 within the Executive Branch, the Court concludes that the government has failed to demonstrate that the PPD-6 is treated as confidential for the purposes of the presidential communications privilege.

The government also argues that, independent of the specific purposes underlying the presidential communications privilege, "it is difficult to imagine how the President could govern effectively if the substance of the President's orders could not be communicated to the administration officials and their subordinates charged with carrying them out." (Gov't Reply at 11.) In so arguing, the government attempts to sidestep the real question before the Court. The question is not whether policy decisions made by the President, as reflected in his directives, can be communicated to his administration officials and then down the chain of command to those rank-and-file staffers charged with carrying them out. Clearly, the President and his administration officials can do that. The question is when, if at all, the government must then disclose those orders under FOIA.

As to that question, the government appears to adopt the cavalier attitude that the President should be permitted to convey orders throughout the Executive Branch without public

18

oversight (*see* Gov't Reply at 11) – to engage in what is in effect governance by "secret law."[12]

Such a position conflicts with the very purpose of FOIA, for it is "[w]ithout question" that FOIA

is "broadly conceived . . . to permit access to official information long shielded unnecessarily

from public view and attempts to create a judicially enforceable public right to secure such

information from possibly unwilling official hands." *Dep't of Air Force v. Rose*, 425 U.S. 352,

361 (1976) (internal quotation marks omitted). For this reason, the D.C. Circuit has concluded

that Congress "indicated unequivocally that the purpose of [FOIA] was to forbid secret law."

*Sterling Drug, Inc. v. F.T.C.*, 450 F.2d 698, 713 (D.C. Cir. 1971) (Bazelon, C.J., concurring in

part and dissenting in part); *see also Schwartz v. Internal Revenue Serv.*, 511 F.2d 1303, 1305

(D.C. Cir. 1975) ("The purpose of this limitation is to prevent bodies of 'secret law' from being

built up and applied by government agencies."). Although the cases disapproving of bodies of

"secret law" have arisen when the government has attempted to claim the deliberative process

privilege to withhold final or post-decisional documents, *see, e.g., Coastal States Gas Corp.*, 617

F.2d at 867; *Schwartz*, 511 F.2d at 1305; *Ash Grove Cement Co. v. F.T.C.*, 511 F.2d 815, 818

(D.C. Cir. 1975), these same hortatory principles have relevance to the presidential

communications privilege, particularly in cases (like this one) where a *final*, *non-classified*,

communication is widely distributed within the Executive Branch and implemented by lower-

level staff members in a manner similar to any other agency "statement[] of policy" that is

presumptively subject to disclosure under FOIA. *See generally* 5 U.S.C. § 552(a)(2) (defining

the documents which agencies must "make available for public inspection and copying,"

including those "statements of policy . . . which have been adopted by the agency and are not

published in the Federal Register"). Holding otherwise surely "would have far-reaching

---

[12] The Court finds equally troubling the government's complementary suggestion that "effective[]" governance requires that a President's substantive and non-classified directives to Executive Branch agencies remain concealed from public scrutiny. (*See* Gov't Reply at 11.)

implications for the entire executive branch that would seriously impede the operations and scope of FOIA." *Judicial Watch*, 365 F.3d at 1119. There would be no effective limitation on a President's ability to engage in "secret law" and, at least for presidential directives, FOIA would become "more . . . a withholding statute than a disclosure statute." *Mink*, 410 U.S. at 79.

## CONCLUSION

For these reasons, the Court rejects the government's unwarranted expansion of the presidential communications privilege at the expense of the public's interest in disclosure under FOIA and therefore concludes that the PPD-6 is not exempt from disclosure under Exemption 5 of FOIA.

Accordingly, the government's motion for summary judgment [Dkt. No. 11] will be **DENIED**, and plaintiff's cross-motion for summary judgment [Dkt. No. 15] will be **GRANTED**. An Order consistent with this Memorandum Opinion is being issued on this date.


                                                  _____/s/_____
                                                  ELLEN SEGAL HUVELLE
                                                  United States District Judge

Date: December 17, 2013